## NORTH RIVER ELECTRIC LIGHT & POWER CO. v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. February 9, 1900.)

1. MUNICIPAL CORPORATIONS—PAROL CONTRACTS.

Where a city, having authority to contract for street lighting, made a contract therefor, which was duly fulfilled, the fact that it was not in writing, as required by its charter, did not preclude the contractor's right of recovery.

2. SAME—RATIFICATION.

Where there has been a bona fide performance of a contract with a city for street lighting, of which it had the benefit, the subsequent ratification thereof by the commissioner of buildings, etc., and the board of public improvements, who, under the charter, had general power over such matters, entitled the contractor to his pay thereunder, though the contract was not properly executed when made.

3. SAME—PAYMENT.

Where street lighting was absolutely necessary, and had been furnished a city at a reasonable price, at the request of its commissioner of buildings, etc., and board of public improvements, who, under its charter, had administrative authority thereof, and who, acting in entire good faith, but under a mistake of law, deemed themselves unauthorized to make a written contract, application for payment therefor need not be made to the legislature, but relief may be granted by the courts.

4. SAME—STREET LIGHTING—FAILURE TO ADVERTISE FOR BIDS.

Where it was absolutely necessary for a city to obtain street lighting at once, the fact that it contracted therefor at a reasonable price, without first advertising for bids, as required by its charter, does not preclude the contractor from recovery, since such charter provision is only to insure economy, and exclude favoritism and corruption in furnishing labor, etc., and does not apply where the delay occasioned thereby would work irreparable mischief.

Ingraham and Rumsey, JJ., dissenting.

Submission of controversy on agreed statement of facts by the North River Electric Light & Power Company against the city of New York.   Judgment for plaintiff.

The statement of facts which the parties agreed to submit to the court for the determination of their controversy is as follows: "First. That the plaintiff is a domestic corporation, duly incorporated and existing under the laws of the state of New York, located and doing business in the city of New York. Second. That the defendant, the city of New York, is, and was at all the times hereinafter stated, a municipal corporation.   Third. That in the regular course of its corporate business the plaintiff did, on or about the 1st day of January, 1898, duly enter into a written contract with the defendant to furnish electric lights for the purpose of lighting certain streets, public places, and public buildings of the defendant from the 1st day of January, 1898, to the 1st day of January, 1899, at an agreed price, payable monthly, and fixed and determined by the terms of said contract, which said terms were in all respects reasonable and fair.   Fourth. That, pursuant to said contract, the plaintiff did furnish such lights to said defendant from 1st of January, 1898, to 1st of January, 1899, and the said defendant did have and receive the same, and paid monthly therefor said agreed price, as provided by said contract.   Fifth. That at the expiration of said contract no contract in writing was executed between the parties hereto, for the reasons hereinafter stated, but that from the said 1st day of January, 1899, and from month to month thereafter, to and including the 30th day of September, 1899, the plaintiff did, at the request of the commissioner of public buildings, lighting, and supplies, one of the officers of the defendant corporation, having charge on its behalf of the lighting of the streets, public places, and public buildings of said city, furnish to the defendant lighting as had been furnished under the contract already mentioned, and did continue to furnish and supply electric lighting to the defendant in the streets, public places, and public buildings of said defendant in the same manner and at the same price as provided by said contract, and as it had theretofore done; and that said defendant has had, received, and used such service and lights from said plaintiff for said time.   Sixth. That said lighting was furnished to the amount set forth in the itemized account thereof hereto annexed, and marked 'Exhibit A,' which is hereby referred to and made a part hereof, with the same effect as though set forth in full herein.   Seventh. That the lighting furnished by plaintiff to defendant at the times above set forth, namely, from January 1, 1899, to September 30, 1899, was reasonably worth the sum of $119,146.85.   That no part of said sum has been paid; that there were and are no offsets or counterclaims thereto, and the claim in this controversy is for that sum, with interest on the various parts thereof, as hereinafter stated.   That notice of his claim, with a demand for payment of $65,639.70 thereof, was duly served on the comptroller of the city of New York on the 1st day of June, 1899, and, a further notice for a demand for payment of $53,507.15 was duly served on the said comptroller on the 7th day of October, 1899, pursuant to the provisions of section 261 of the Greater New York charter, and that thirty days have elapsed since the service and demand, and that said comptroller has neglected and refused to make an adjustment or payment thereof for thirty days after such presentment.   Eighth. That at the time of the furnishing of the lights as above set forth there was in the part of the city in which the said lights were furnished no other corporation having wires, appliances, or apparatus for supplying electric lighting, and that the lights furnished by the plaintiff were the only lights available for said lighting at such time.   Ninth. That at the times during which the light was furnished as above mentioned, the furnishing of light in the said streets, public places, and public buildings of the portion of the city already mentioned was a public necessity.   That such lighting was absolutely necessary, not only for the purpose of permitting the use of said streets or other public places by the citizens of the city of New York, but also for the further purpose of the prevention of accidents arising from the absence of lights in said streets, avenues, public places, and public buildings, for which the city of New York might be liable in damages.   There was also absolute necessity for the furnishing of the said lights as aforesaid in order that the fire department, the police department, and

the other departments of the city government should perform their functions for the protection of the city and of its citizens. Tenth. That the reason no written contract has been entered into for the furnishing of said lights is as follows: On December 5, 1898, resolutions for gas and electric lighting in the various boroughs of the city of New York were duly adopted by the board of public improvements, and proper ordinances to the same effect forwarded to the municipal assembly by the said board of public improvements for adoption. That said municipal assembly refused to take any action whatever, and, there being pressing necessity for the lighting of the city, the said ordinances were recalled from the municipal assembly by the board of public improvements, and resolutions were passed by the said board to let the said contracts. In pursuance of the same policy of obstruction which had prevailed in the municipal assembly, no sooner had bids been called for by public advertisement and obtained for public lighting by the commissioner—among others the bid of the plaintiff, which was the only bid for lighting the territory already mentioned; that is to say, almost the entirety of the borough of the Bronx—than there appeared a taxpayer, one Joseph Blank, who brought, in the Second district, an action to enjoin Henry S. Kearney, the commissioner of public buildings, lighting, and supplies of the city of New York, and the city of New York, from awarding or executing any contract for the lighting by gas or electricity of any of the streets, parks, highways, piers, or public places in any of the boroughs of the city of New York until such light shall have been first authorized by resolution of the board of public improvements and the municipal assembly of the said city, etc. The allegation of the complaint was that the defendant the commissioner of public buildings, lighting, and supplies had advertised that he would open bids for lighting the streets, buildings, and parks in the city, and that he would, after opening such bids, award such contract as he might deem for the best interests of the city of New York. The result of this action was an injunction pendente lite restraining the letting and execution of these contracts (only a day or two since reversed). The attempt to block the execution of these lighting contracts having been thus successful, the commissioner of public buildings, lighting, and supplies, having no other course to pursue, resubmitted to the board of public improvements the resolutions for lighting the city for 1899. It may be stated that there was appropriated for the lighting of the city for this year the sum of $2,685,869.26. That these companies have proceeded with their lighting at the earnest solicitation of the law department, which hoped to find some way to solve the difficulty. The law department has been notified lately, however, by several of these companies, that they cannot proceed further with this lighting without receiving payment, without crippling themselves financially. That thereafter, public advertisement having been duly had, the only bid made upon the said letting of the contract for electric lighting of the borough of the Bronx for the year 1899 was the bid of this plaintiff, which was at the same prices as those stated in the prior contract already mentioned. That on October 3, 1899, the said ordinances were duly resubmitted by the board of public improvements to the municipal assembly for adoption, but that the said municipal assembly again refused and neglected, and does still refuse and neglect, to take any action whatever upon the said proposed ordinances for lighting the boroughs of the city. Eleventh. That bills for the lighting above mentioned by plaintiff from 1st January, 1899, to 30th September, 1899, having been duly rendered at the expiration of each month to the department of public buildings, lighting, and supplies, and that the said bills, which were for the amounts specified in Exhibit A, hereunto annexed, have been approved by the commissioner of public buildings, lighting, and supplies, and duly filed with the comptroller of the city of New York. Twelfth. That the only objection of the comptroller of the city of New York and of defendant to auditing and paying said bills is that no written contract has been entered into between the plaintiff and defendant. And defendant admits its liability for all lighting furnished after 22d May, 1899, and mentioned herein; that is, from the date of the granting of the injunction by the special term of the supreme court in the action of Blank v. Kearney, 59 N. Y. Supp. 645, leaving in dispute only the lighting furnished between January 1 and May 22, 1899. Thirteenth. That there is an appropriation available for the purpose of legally paying the said bills. Fourteenth.

It is claimed on the part of the plaintiff that the defendant is liable for the amounts for which judgment is hereinafter prayed. Fifteenth. It is claimed on the part of the defendant that it is not liable for any part of the amounts claimed by plaintiff."

Plaintiff demands judgment for the sum of $119,146.85, together with interest as follows: On $13,419.90 thereof from the 1st day of February, 1899, on $12,-121.20 thereof from the 1st day of March, 1899, on $13,437.45 thereof from the 1st day of April, 1899, on $13,087.80 thereof from the 1st day of May, 1899, on $13,573.35 thereof from the 1st day of June, 1899, on $13,135.50 thereof from the 1st day of July, 1899, on $13,584.15 thereof from the 1st day of August, 1899, on $13,598 thereof from the 1st day of September, 1899, and on $13,169.50 thereof from the 1st day of October, 1899; together with the costs and disbursements of this action. Defendant demands judgment that this proceeding, controversy, and action be dismissed, with costs.

Argued before VAN BRUNT, P. J., and RUMSEY, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Henry J. Hemmens, for plaintiff.

Theodore Connoly, for defendant.

David McClure, for the Consolidated Gas Company of New York and the Brush Electric Illuminating Company of New York.

O'BRIEN, J. The precise question we are called upon to determine is whether the failure to make a written contract between the parties hereto is fatal to the plaintiff's right to recover; or, differently expressed, and using the language of the submission, "the only objection of the comptroller of the city of New York and of defendant to auditing and paying said bill is that no written contract has been entered into between the plaintiff and defendant." That would imply that all the requirements leading up to a valid contract had been complied with except the reduction of the same to writing, and its formal execution. The changes effected by the Greater New York charter in establishing departments of the municipal government, and in conferring upon the heads thereof powers of administration, subject to the right of the municipal assembly to regulate by general ordinance the exercise of such powers, led to a contrariety of opinion as to the person by whom or the body by which particular public duties should be performed. As a consequence, in December, 1898, a controversy arose, which still continues, between the department of public buildings, lighting, and supplies and the board of public improvements on the one hand and the municipal assembly on the other, as to their respective rights, powers, and duties relative to contracts for lighting the streets and public buildings of the city. Assuming that it was necessary for the assembly to first pass ordinances, the board of public improvements prepared suitable resolutions and ordinances on that subject, and forwarded them to the assembly for adoption. Notwithstanding the urgent necessity for action, the assembly absolutely refused to act, and, various lighting companies having threatened to cut off the supply of light unless contracts were made in writing, the resolutions were withdrawn from the assembly in March, 1899, and suitable contracts—among others the one here in question—were made by the proper officers. It appears, as a result of that contest, that the city would have been plunged in darkness after January 1, 1899, had it not been that the various lighting companies, on

being applied to, expressed a willingness to proceed without written contracts, provided assurances were given that the city authorities would see to it that they should be eventually paid. Such assurances were given by the commissioner and the board, who were the officers upon whom the duty devolved of attending to the lighting, of the streets of the city; and, as stated by the corporation counsel, the lighting was furnished "at the earnest solicitation of the law department, which hoped to find some way to solve the difficulty." Thus the officials, alive to the necessity and importance of having the city lighted at night, were anxious to discharge their duty, in the performance of which they had been hampered and obstructed by the assembly. That there was serious doubt as to where the power resided when the question was presented is apparent from the view taken by the judge at special term in the Second department in the case of Blank v. Kearney, who enjoined the municipal officers from proceeding to execute any lighting contracts without the approval of the assembly; and, though it was subsequently held by the appellate division in that department, reversing the special term (see 61 N. Y. Supp. 79), that those officers, namely, the commissioner of buildings, etc., and the board of public improvements, could proceed without any affirmative action of the assembly, still the fact remains that their doubt had a reasonable foundation. Their attitude and action, therefore, should be viewed, not in the light of their position subsequent to the decision of the appellate division, when, having their rights confirmed, they entered into contracts with the lighting companies, but rather of their position as it existed in December, 1898. They then honestly believed that they were without power to make a written contract without the approval of the assembly,—which they could not obtain; and, although it was thereafter decided that they were mistaken in that view, such mistake had a reasonable basis. This fact does not affect the good faith and honesty of the course they pursued; their mistake being natural under the new conditions which arose upon the Greater New York charter taking effect.

Regard being had to the fact that the only objection made is that the contract was not in writing, it would appear that all the necessary preliminary steps essential to a binding contract had been taken, and thus all the evils were avoided which the statute was intended to guard against; such as favoritism in awarding contracts without obtaining bids. Hence the failure to execute a written contract would not be fatal to the plaintiff's right to recover. Paul v. City of New York (Sup.; Dec. 8, 1899) 61 N. Y. Supp. 570. If, however, that is not so, we are still of opinion that upon the conceded facts, the city is liable to pay for the light furnished. Deeming themselves to be without power to execute a written contract, the officials pursued the only course open by authorizing the companies to furnish the light upon terms and conditions which it is admitted were reasonable, and which were the same as those that had been imposed by the written contracts of the previous year, and which, after public letting, had been entered into between the companies and the city. It is conceded that the prices agreed upon were fair and reasonable, and the obligation sought to be enforced is just. But it is urged that no recovery

can be had, for the reason that the contract was not made in the particular way and manner prescribed by the charter. Many cases may be found wherein the salutary rule is announced that the statutory provisions as to the manner of making a contract binding upon the city must be complied with, and limiting the power of the city and its officers. But on examination these cases will be found to be instances where an attempt has been made to ignore or evade the statute, or to enter into a contract ultra vires, or one which the officers had no right or power to make. In Abells v. City of Syracuse, 7 App. Div. 501, 506, 40 N. Y. Supp. 237, after stating the "well-known principle that a municipal corporation finds the measure of its power in the statute creating it or imposing the power," it is said:

"This principle has been invoked in many cases of local improvement in cases where fraud was apparent and collusion manifest between the corporation officers and the contractors; and when, under the guise of extra work, they have sought to avoid the publicity of advertising for bids for work and material, the courts have been careful to protect the people from such fraudulent contracts and contrivances, and hold the municipality strictly to its statutory duties and obligations; but in other cases, like the one at bar, where the corporation has received a substantial benefit, and retained such benefit, and the work was necessary in carrying out the contract, either as extra work or to meet exigencies which were unforeseen when the contract was entered into, the courts have been more lenient in their construction of corporate powers upon principles of equity."

Again, in Moore v. Mayor, etc., 73 N. Y. 248, the court say:

"When there has been a bona fide performance of a contract, of which the city has had the benefit, there is a strong equity in favor of the contractor seeking his pay, entitling him to the benefit of a ratification, even of a void contract, upon slight evidence, if the ratifying body has general power over the subject of the contract, and of an estoppel when an estoppel fairly results from the conduct of the general agents of the city."

Here, when the power of the officials who could make a written contract was subsequently determined, they complied with all the preliminary steps as to advertising for bids, etc., and in April, 1899, made a written contract, which, in terms, covered the whole year of 1899, and thus, so far as they were able, ratified what had been done in the way of furnishing light for the prior months of the year.

In Port Jervis Waterworks Co. v. Village of Port Jervis, 151 N. Y. 117, 45 N. E. 389, the court say:

"It is true that no express contract was entered into between the parties for the three years in controversy. But the water was furnished by the plaintiff and accepted by the defendant during that time under circumstances in which the law will imply a contract to pay what the water was fairly and reasonably worth for the period."

Here the officials who directed the furnishing of the light were the persons who had control and jurisdiction over the subject of lighting, and they did not attempt to violate or evade the requirements of the statute by entering into a contract contrary to its provisions. Doubtful of their powers concerning the execution of a written contract, and in an emergency thus created, and under the pressure of a public necessity, which required that they should act in order to avert a condition of affairs which would not only be a menace to persons and property, but, if permitted even for a short time, would be a public nuisance, they appealed to the lighting companies to furnish the light,

which was supplied, and which, it is conceded, in good faith and com-
mon honesty the city should pay for. It is further conceded that the
course adopted was the result of an honest and conscientious desire
on the part of the public officials and the lighting companies to meet
a great public emergency with reference to a situation concerning
which all thought no provision had been made by law. That the
officials did what was honest and best in the emergency by entering
into an arrangement by which light was obtained at reasonable rates,
so as to avoid precipitating the city at night into utter darkness, is
conceded, as are the facts that the city had the benefit of the light, and
that it should be paid for. The only question seems to be whether
application for such payment should be made to the courts or to the
legislature. We do not think that the court is without power to
grant relief in a case where it is conceded that a thing of absolute
necessity has been furnished at a reasonable price at the request of
the officials having administrative charge of that department of the
city's affairs, who, acting in entire good faith, but under a mistake of
law, deemed themselves wanting in power to make a written contract.
We do not think the statute was intended to take away the power
of the city officials charged with the duty of making such contracts
to incur obligations under such a state of facts as is here presented.
We find many cases holding that a municipality having the legal
power to contract for a thing may be bound by an implied contract
in the same manner as an individual or a private corporation. Har-
lem Gaslight Co. v. Mayor, etc., of New York, 33 N. Y. 309; In re
Dugro, 50 N. Y. 513; Nelson v. Mayor, etc., of New York, 63 N. Y.
535, at page 544; Moore v. Mayor, etc., 73 N. Y. 238; Baird v. Mayor,
etc., 96 N. Y. 567–583; Port Jervis Waterworks Co. v. Village of Port
Jervis, 151 N. Y. 111, 45 N. E. 388; McCloskey v. City of Albany, 7
Hun, 472; Peterson v. Mayor, etc., 17 N. Y. 449, 453; Kramrath v.
City of Albany, 127 N. Y. 575, 28 N. E. 400; Central Transp. Co. v.
Pullman's Palace-Car Co., 139 U. S. 24–60, 11 Sup. Ct. 478, 35 L. Ed.
55; Dill. Mun. Corp. (4th Ed.) § 459; Marsh v. Fulton Co., 10 Wall.
678, 19 L. Ed. 1040; People v. Board of Sup'rs of City and County of
San Francisco, 11 Cal. 43; Argenti v. City of San Francisco, 16 Cal.
256; Brush Electric Light Co. v. City Council of Montgomery, 114 Ala.
433, 21 South. 960; Pimental v. San Francisco, 21 Cal. 352; Taylor
v. Lambertville, 43 N. J. Eq. 107, 10 Atl. 809.

The leading case in this state supporting the theory of an obligation
upon an implied contract is Harlem Gaslight Co. v. Mayor, etc., of
New York, supra, which has been cited with approval in many subse-
quent cases, and which, so far as we have found, has never been
expressly overruled. There the court said:.

"The power and duty of the municipal government to furnish light for the
streets and avenues of the city is not disputed or put in controversy in this
action. Indeed, it could not be with any show of reason or good sense. In
our northern latitudes, when darkness prevails for over half the twenty-four
hours for a large part of the year, light diffused through the public streets
and avenues is a predominant and urgent necessity which no well-governed
city can do without. * * * The modern gaslight diffusing its rays over every
part of the public thoroughfare is a source of pleasure and comfort and conven-
ience, as well as a security against crime and disorder which no other agency
can supply. It is indispensable at all times, and no municipality can be said

to be well governed which is not able to command its presence under all circumstances. Nor can it be maintained that a municipal corporation may not be made liable, like a natural person, upon an implied assumpsit, unless the general rule is modified and changed by some positive legislation."

And in speaking of the failure to comply literally with the provisions of the law in regard to lighting contracts it is further said in the same case:

"The purpose of the statute is to insure economy in the public administration, and honesty, fidelity, and good morality in the administrative officers. Competitive offers or bids may have no other object but to insure economy and exclude favoritism and corruption in the furnishing of labor, services, property, and materials for the uses of the city. This was the purpose, and the only purpose, of the framers of the statutes, and when they have this effect given to them nothing further is needed. They are not to have such a construction as to defeat this purpose, to impede the usual and regular progress of the public business, or to deprive the inhabitants, even temporarily, of those things necessary and indispensable to their subsistence, their health, or the security and protection of their persons or property. Contingencies may arise when services, materials, and property above the prescribed value may be immediately needed, and where competitive offers and written contracts would be unserviceable or impossible. In such a case the statutes would not apply, because such application could not have been intended. Whenever the nature of the service or of the property needed for the public uses, or the time within which it must be had to prevent irreparable mischief under competitive offers, is impossible, then the provisions of the acts referred to cannot apply, because such could not have been the intention of the lawmakers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct."

Upon the agreed facts here there was shown a great public necessity, and an emergency not contemplated by the statute; one which would not permit of delay, but required immediate action by the defendant to protect its interest, as well as the lives and property of its citizens. There being, therefore, no attempt to override the statute, or to do that which it prohibited, and a situation being presented to which the statute did not apply, we think the plaintiff may invoke the rule of liability similar to that relating to an implied contract.

It will be noticed that we have not thus far adverted to nor placed any stress upon the conceded fact that the plaintiff here was the only company having the ability to furnish lights in the territory in question, and therefore had no competitor, and that, under the former advertisement for bids, was the only bidder. Upon the argument this fact was not relied upon, and request was made for a decision which would be equally applicable to the other companies who, by permission of the court, were heard upon the argument and in respect to which that fact did not exist; there being in the territory, or a portion of it, in which they furnished light, other competitors. Considering, then, the question as we have done, stripped of that circumstance, we think that the unusual and exceptional facts appearing of the light being furnished in an emergency at the request of the city officials, but at a price fixed by the officer having administrative charge of that part of the city's affairs,—the failure to enter into a written contract having resulted from a technical mistake,—together with the evident good faith and entire honesty of all parties, present a case never likely to create a precedent for unlawful raids upon the treasury. Whether we invoke the rule of an implied contract or not, there is, upon the

facts here appearing, sufficient to justify our conclusion that the city should pay its just obligation incurred by its officers in the discharge of a great public duty, and as the result of a pressing public necessity, to save its citizens from danger to person and property consequent upon the city being in darkness.

Judgment should therefore be for the plaintiff, but, under the circumstances, without costs.

PATTERSON, J., concurs.

VAN BRUNT, P. J. I concur in the result of Mr. Justice O'BRIEN'S opinion. The city authorities were bound not to allow such a condition of things to obtain that the streets became, so to speak, public nuisances, which they would be, if allowed to remain unlighted. If the streets were to remain in darkness, the city would be liable for any and all damages which might be sustained because of the want of light. This condition of things the authorities having charge of this branch of the city government were bound to avoid, and, as they were not responsible for the situation, and had done everything in their power to avoid the difficulty which had arisen, there is an implied obligation upon the part of the city to pay for supplies, etc., furnished to it in order to avoid the great evils which would have ensued from allowing the city to remain in darkness.

INGRAHAM, J. (dissenting). The question in this case is one of great importance, involving, as it does, the liability of the city of New York for contracts made by public officers without compliance with the provisions of the charter in relation to the execution of contracts and the incurring of liabilities by the city of New York for supplies furnished to the city where no contract has been made as provided for by the charter. That the plaintiff should be paid for the services that it has rendered in lighting the streets of the city of New York for the period named, and that the lights were furnished under the assurance of the city officials that some means would be found to provide for the payment of their bills, should not blind us to the fact that we are dealing with a purely legal question, involving, as it does, a liability of the taxpayers of the city of New York for the acts of public officials appointed under legislative authority. This court is now asked to grant to this plaintiff a judgment against the city of New York, which must be paid out of the money raised by taxation; and the question which arises at the threshold of the case, and which must be controlling upon us in its determination, is whether, under the charter of the city of New York, there was imposed, by the facts stated, upon the municipality, a legal obligation. We can grant to this plaintiff no judgment which would take from the city of New York a large sum of money, unless under the charter of the city the law imposes such an obligation upon the municipal corporation. The facts upon which the plaintiff seeks to impose this liability upon the city are as follows: The plaintiff, a corporation organized to supply electricity for the purposes of lighting the streets and public buildings, had been furnishing electricity to the city under a contract made

with the city as prescribed by law.   That contract expired on December 31, 1898.   For reasons which it is not necessary to state, the public officials in whose charge the lighting of the city had been placed by the charter failed to make a new contract for lighting this particular portion of the city, and on January 1, 1899, no contract was in existence.   At the request of the municipal officers, the plaintiff continued to light the streets which it had theretofore lighted, receiving the assurance of the public officials that some means would be provided to pay them for the services rendered; and in this action they seek to recover for such services.   The duties and obligations imposed upon municipal corporations have become questions of the greatest importance under the modern conditions in which we are placed.   The enormous growth of modern cities; the necessity of providing for the health, protection, and comfort of their inhabitants, has entailed upon municipal corporations largely increased duties and obligations, with a corresponding increase of the power given to the municipality and the officers designated to act for it.   In considering this question it is essential that we should keep clearly in view the nature of the duty imposed upon the municipal corporation and upon the officials who are authorized by law to represent it.   As was said by Judge Dillon in his work on Municipal Corporations (volume 1 [4th Ed.] p. 34):

"If we analyze the complex powers usually conferred upon a municipality in this country, we shall discover that these are of two general classes, viz.: (1) Those which relate to health, good government, efficient police, etc., in which all the inhabitants have an equal interest, and ought to have an equal voice; (2) those which directly involve the expenditure of money, and especially those relating to local improvements, the expense of which ultimately falls upon the property owners."

This distinction is carried through all of the legislative provisions in relation to the performance of these duties by municipal corporations and the authority given to the public officers to perform these duties.   Among the most important of these duties is that of maintaining the public streets and highways within the municipality which include the lighting of streets.   This duty directly relates to the health, good government, and efficient police of a municipality, and is thus directly within the first class before referred to.   The nature of this obligation or duty is clearly governmental.   By its exercise the municipal corporation receives no direct benefit, the object being the proper protection, preservation, and well-being of the inhabitants of the municipality, and generally of the inhabitants of the state.   The expense of performing this duty, however, is imposed upon the municipal corporation, and it is authorized to raise by taxation the money necessary to its performance.   In the performance of such obligation thus imposed, and in the exercise of the power granted to the officers of the corporation, the charter of the corporation by which it is created is its organic law.   Neither the corporation nor its officers can do any act, or make any contract, or incur any liability not authorized thereby, or by some legislative act applicable thereto.   All acts beyond the scope of the powers granted are void.   At page 528 (section 457) Judge Dillon says:

"The general principle of law is settled beyond controversy that the agents, officers, or even the city council of a municipal corporation, cannot bind the corporation by any contract which is beyond the scope of its powers, or entirely foreign to the purposes of the corporation. * * * This doctrine grows out of the nature of such institutions, and rests upon reasonable and solid grounds. The inhabitants are the corporators; the officers are but the public agents of the corporation. ' The duties and powers of the officers or public agents of the corporation are prescribed by statute or charter, which all persons not only may know, but are bound to know. * * * These considerations vindicate both the reasonableness and necessity of the rule that the corporation is bound only when its agents or officers, by whom it can alone act, if it acts at all, keep within the limits of the chartered authority of the corporation."

Further, at page 540, it is said:

"An absolute excess of authority by the officers of a corporation, in violation of law, cannot be upheld; and, where the officers of such a body fail to pursue the requirements of a statutory enactment under which they are acting, the corporation is not bound. In such cases the statute must be strictly followed, and a person who deals with a municipal body is obliged to see that its charter has been fully complied with. When this is done, no subsequent act of the corporation can make an ultra vires contract effective."

Further, at page 543, it is said:

"Where the charter or incorporating act requires the officers of the city to award contracts to the lowest bidder, a contract made in violation of its requirements is illegal; and in an action brought on such contract for the work the city may plead its illegality in defense; and neither the municipality nor the subordinate officers can make a binding contract for such work except in compliance with the requirements of the law."

As we have seen, the duty to maintain and regulate the streets in the city of New York is imposed upon the municipal corporation by the legislature, and the methods by which that duty is to be performed are expressly regulated by the organic law under which the corporation exists; and in the performance of that duty or obligation the officers of the municipal corporation must strictly follow the provisions of the charter. It is only where such provisions have been so followed, and a contract is made in strict compliance with the legislative direction, that the corporation is liable. This principle has been applied in this state in an unbroken line of authorities. It has been again and again reiterated by the highest court of the state. It will be necessary to cite but one or two cases in which this rule has been distinctly and emphatically maintained. Thus, in McDonald v. Mayor, etc., 68 N. Y. 27, it is said:

"Nor can it be that the provisions of the statute are alone for the instruction of the department and officials of the defendant. They were a restraint upon them, but upon other persons as well. They put upon all who would deal with the city the need of first looking for the authority of the agent with whom they bargain. Quite clearly do they impose upon the paying agent of the defendant a prohibition against an unauthorized expenditure. And are they not also a restraint upon the municipality itself? They are fitted to insure official care and deliberation, and to hold the agents of the public to personal responsibility for expenditure; and they are a limit upon the powers of the corporation, inasmuch as they prescribe an exact mode for the exercise of the power of expenditure. * * * It is fundamental that those seeking to deal with a municipal corporation through its officials must take great care to learn the nature and extent of their power and authority."

Then, in speaking of the claim that the defendant, having appropriated the materials of the plaintiff, and used them, was bound to deal justly, and pay him the value of them, the court say:

"Here there is an express legislative inhibition upon the city that it may not incur liability unless by writing and by record. How can it be said that a municipality is liable upon an implied promise when the very statute which continues its corporate life, and gives it its powers, and prescribes the mode of the exercise of them, says that it shall not, and hence cannot, become liable, save by express promise?  *  *  *  It is plain that, if the restriction put upon municipalities by the legislature for the purposes of reducing and limiting the incurring debt and the expenditure of the public money may be removed upon the doctrine now contended for, there is no legislative remedy for the evils of municipal government, which of late have excited so much attention and painful foreboding. Restriction and inhibition by statute are practically of no avail if they can be brought to naught by the unauthorized action of every official of lowest degree, acquiesced in, or not repudiated, by his superiors.  *  *  *  The statute may not be carried further than its intention, certainly not further than its letter. Its purpose is to forbid and prevent the making of contracts by unauthorized official agents for supplies for the use of the corporation. This opinion goes no further than to .hold that, where a person makes a contract with the city of New York for supplies to it, without the requirements of the charter being observed, he may not recover the value thereof upon an implied liability."

See, also, Dickinson v. City of Poughkeepsie, 75 N. Y. 65; Smith v. City of Newburgh, 77 N. Y. 133.

The same rule is stated as well settled in 15 Am. & Eng. Enc. Law (1st Ed.) 1086, where all the authorities are cited. It has been attempted many times to impose upon this rule an exception in cases where an immediate necessity for the article to be procured or services to be rendered has arisen, so that it would be impracticable to comply with the express provisions of the contract; and the learned counsel for the plaintiff has endeavored to bring this case within such an exception, and the case of Harlem Gaslight Co. v. Mayor, etc., of New York, 33 N. Y. 309, is cited as an authority. In that case there were two opinions of the court,—one by Judge Porter, in which he held that the contract there in question was not within the legitimate scope and intent of the provisions of the amended charter; and one by Judge Brown, to the same effect. The case does not show with which of these opinions the court agreed, but, even by Judge Brown's opinion, the right of the plaintiff to recover is put upon the express ground that, under the particular terms of the charter then in force, it could not have been intended to apply. But this case cannot be considered as an authority for a proposition that, when the furnishing of a special object or the rendition of a special class of services is expressly provided for by the charter, and provision is expressly made for the making of a contract for the supply of such materials or the rendition of such services, the court would nullify the statute, and hold that it could not apply, because, in its opinion, an immediate necessity arose for a violation of the charter. The question in this case must come down to the determination of the effect of the provisions of the charter regulating the making of contracts like the one in question. If there was no special provision in the charter for making contracts for lighting the streets or supplying gas or electricity to the city for lighting purposes, it might be that the rule ap-

plied in the case of Harlem Gaslight Co. v. Mayor, etc., of New York, supra, and in the case of Gleason v. Dalton, 28 App. Div. 555, 51 N. Y. Supp. 337, would be applicable, and that it could be held that the general provision as to contracts for supplies to the city of New York would not apply in a case where there was but one bidder who could compete, "or where the subject-matter of the contract is such that competitive proposals work an incongruity, and are unavailable as affecting the final result; or where they do not produce any advantage, but the nature of the supply requires that it be determined from inspection and test, which are made up from present examination and trial, and depend upon special knowledge and judgment; or where the thing to be obtained is a monopoly, or the requirement is of personal skill or professional services, or it is practically impossible to obtain what is required and observe such form,—the language of the statute does not apply, and the particular case falls within the exception." Gleason v. Dalton, supra. After the decision of the court of appeals in the case of Harlem Gaslight Co. v. Mayor, etc., of New York, supra, the legislature adopted a provision regulating the making of contracts for lighting the streets and buildings, which provision was continued by section 69 of the consolidation act. It was then provided that the commissioner of public works, in conjunction with the mayor and comptroller, is authorized, from time to time, to contract for lighting the streets, avenues, piers, parks, and places of the city with gas or other illuminating material by one or more contracts, to be let at public letting, as provided by law, for a period of one year, or any part of a year, and commencing and terminating at any date the said board may determine. There was here a special legislative provision regulating such contracts. By this section the public officers named were authorized to contract for lighting streets, etc., for a period of one year, or any part of a year; but such contracts were required to be let at a public letting. The new charter of the city of New York (chapter 378 of the Laws of 1897, which took effect on the 1st day of January, 1896) made a material change in the provisions in force for making contracts for lighting public streets and buildings. By section 573 it was provided that the commissioner of the department of public buildings, lighting, and supplies should have cognizance and control of the making "and performance of contracts when duly authorized in accordance with the provisions of this act, and for the execution of the same in the matter of furnishing the city or any part thereof, with gas, electricity or any other illuminant"; and it was further provided that the said commissioner should prepare all contracts relating to the city for submission to the board of public improvements. By section 587 it is provided that:

"The commissioner of public buildings, lighting and supplies * * * shall prepare the terms and specifications under which contracts shall be made for lighting the streets, public buildings and parks of said city. Separate contracts shall be made for such lighting in each of the boroughs of the city of New York, or in such subdivisions of the city as may appear to the board of public improvements and the municipal assembly to be for the best interest of said city. * * * Such bids shall be prepared and advertised for, and such contracts shall be executed in the manner prescribed for herein as to other contracts entered into by said city or the departments thereof. Contracts shall be made for the term of one year and shall be awarded to the lowest bidder."

By section 419 of the charter it is provided that:

"All contracts shall be entered into by the appropriate heads of departments, and shall, except as herein otherwise provided, be founded on sealed bids or proposals made in accordance with public notice duly advertised in the City Record and the corporation newspapers, the said notice to be published at least ten days. If the head of a department shall not deem it for the best interest of the city to reject all bids, he shall without the consent or approval of any other department or officer of the city government award the contract to the lowest bidder, unless the board of public improvements by a vote of 'a majority of its members of whom the mayor and comptroller shall be two, shall determine that it is for the public interest that a bid other than the lowest shall be accepted."

It cannot be doubted but that these provisions of the charter provide a complete scheme for lighting the public streets and buildings, and for the procuring by the city of the necessary gas, electricity, or other illuminants for that purpose. The commissioner who is to have cognizance and control of the making and performance of contracts for that purpose was designated, and his duty as to such contracts was prescribed by section 587. The number, kind, and location of the lights to be furnished under each of said contracts was to be determined and prescribed by the commissioner. Bids were to be prepared and advertised for and contracts executed in the manner prescribed in the charter as to other contracts entered into by the city or the departments thereof, and such contracts were to be made for one year, and were to be awarded to the lowest bidder. Nothing could be more specific, and it is difficult to see how the legislature could have more clearly indicated its intention to require contracts for the furnishing of gas and electricity or other illuminants to be furnished under general contracts of this kind, to run for one year, and to be let to the lowest bidder, after public advertisement for bids, and restricting the power of the commissioner to make such contracts in any other manner than that prescribed by the charter. It seems to me that it was intended that the contract should provide that the contracting party should furnish to the city the light required by the city, and fix the price that it was to pay. Undoubtedly, the commissioner could, during the year, change the number of lights to be supplied by the contracting party, and the contract could be so arranged that the contracting party would be bound to furnish all lights required under the contract. What seems to me to be the clear intention of the legislature was that these contracts for public lighting should extend over a whole borough, or to such other territorial extent as the board of public improvements should provide, and that within such territory all lights to be furnished should be furnished by the contractor whose bid was accepted under the provisions of this section, and that these contracts should be made for one year. We have thus a complete and consistent scheme for procuring a contractor who will undertake to furnish to the city the necessary light for its public streets, places, and buildings; and the commissioner has no authority to enter into any other contract except such as are authorized by this express provision of the charter. Look for a moment at the effect of any other construction. Any officer holding this position of commissioner of buildings, lighting, and supplies, by simply making daily or monthly contracts,

could evade all the provisions of this statute, and pay to those he pleases the prices he pleases for the services to be rendered to the city; and yet it is perfectly clear that it was the intention of the charter that such contracts should not be made except based upon bids submitted in consequence of public advertisement. These carefully drawn provisions of the charter are evidently intended for the protection of the city, to prevent the making of private contracts. The proper officers are authorized to make contracts, but the methods are prescribed by which they shall be made; and, clearly, it seems to me, the authority of the officials to make a contract is limited to such contracts as should be made in the manner prescribed by the charter. To hold that these express and detailed provisions for regulating the action of the commissioner are inapplicable if the commissioner sees fit to make a contract for a less period than a year, or if he neglects to make a contract as authorized, so that, in order to have the streets lighted, he was required to make private contracts, would give him authority to pay the prices that he pleased and upon the terms that he was pleased to impose, and would be to abrogate this carefully conceived and complete scheme for making contracts for lighting, and frustrate the evident intent of the legislature. That the commissioner had the power to make this contract without the approval of the municipal assembly has been determined by this court in the Second department in the case of Blank v. Kearney, 61 N. Y. Supp. 79 (not yet officially reported), and the mere fact that he neglected to make such a contract until it was too late to advertise for bids would, in my view, give him no right to make other contracts without complying with the provision of the charter. I have no doubt of the justice of this claim, and that this plaintiff, by coming to the aid of the city, and furnishing this light, performed a commendable public service, which would justify the legislature in making provision for the payment of the amount of this claim; but, without expressly abrogating this provision of the charter, I do not think we can give the plaintiff a judgment against the city.

There should, therefore, be judgment for the defendant, with costs.

RUMSEY, J. (dissenting). That the commissioner of public buildings, lighting, and supplies did all in his power to make a contract for lighting with the plaintiff in the manner and for the time required by the statute, and that, so far as he could, he took every step necessary for that purpose, is conceded. It is also conceded that he was prevented from carrying the contract into effect by the failure of the municipal assembly to pass a general ordinance regulating the making of such contracts, and by its refusal to approve this particular contract without giving any valid reason, so that the contract might be amended. It is also conceded that upon the verbal request of the commissioner the plaintiff furnished lights for the time during which it claims to be paid, although the statute authorizing contracts for lighting requires them to be made in a particular way, and for a particular time, and this was not done. Greater New York Charter, §§ 419, 587. And the law seems to be settled that, where the mode of contracting is specially and plainly prescribed and limited, that mode

is exclusive, and must be pursued, or the contract will not bind the corporation. Dill. Mun. Corp. § 449, and cases cited. But it is sought to hold the city liable for what was furnished upon the theory that the lighting was absolutely essential for its safety, and that an emergency had arisen, therefore, which made it necessary that such lighting be had, although the mode prescribed by statute could not be followed. But there was no emergency. The matter was not a casus omissus. The statute had provided for such contracts, and had limited the manner of making them. An honest effort was made by the commissioner to do his duty. He was prevented by the negligence and obstinacy, or worse, of the municipal assembly, and by nothing else. Such a condition of affairs does not raise an emergency which authorizes the city officials to disregard the statute, and permit them to impose a liability upon the city outside of the power granted by law. If an emergency was thus to be created, all that would be necessary to break down all statutory requirements with regard to the furnishing of light or water or protection against fire would be that some official of the corporation should refuse to perform his duty; and in such cases, if the contention of the plaintiff is correct, any law prescribing the manner in which contracts should be made would practically be repealed, and the delinquent officer would have a free hand, and could bind the city by any contract he chose to make. Such cannot be the rule of law. Dill. Mun. Corp. § 449. Neither the case of Harlem Gaslight Co. v. Mayor, etc., of New York, 33 N. Y. 309, nor the other cases cited authorize any such contention. Indeed, I do not believe that a liability can be imposed upon a municipal corporation in any manner except in that provided by statute, however grave an emergency may arise. The powers of municipal corporations are fixed by the law. So far as governmental duties are imposed upon them, the statute not only prescribes the duties, but the manner of their execution; and I can see no reason why their powers in regard to these matters should be extended, or the prescribed manner of their execution abandoned, because the legislature has forgotten or has not seen fit to provide for an unforeseen emergency. There is no rule of law, constitutional or otherwise, that I am aware of, which would authorize any official, from the president of the United States down, to assume any power which the law has not given to him. It is quite true that more than one occasion has arisen in our history where a serious emergency has arisen, to meet which no statutory provision had been made; but I am not aware that in any of these cases the power which was assumed by an executive officer was supposed to have been properly exercised, and whenever it was assumed, so far as my reading goes, he either acted upon his private responsibility, or, having assumed to act by virtue of his office, he procured a ratification of his action by the legislative power as soon as practicable. One of these occasions was when it became necessary to provide, in view of a threatened epidemic of cholera, extraordinary accommodations for the persons who had been quarantined at this port. No provision had been made for any such thing. But it was not supposed that either the state or the city had power to make such provision, and it was made by the governor acting personally, and

using his own money, and relying upon the legislature to indemnify him afterwards, which was done. There can be no stronger illustration of the proposition which I have advanced. Another instance was the action of the president of the United States in 1861 in suspending the writ of habeas corpus in the face of a grave emergency which threatened the very existence of the government. While, undoubtedly, the exercise of an executive function which he was unable to carry out except by a proclamation which he could enforce because he had the army at his back, yet he procured a ratification by that body of his act, for the reason, if I recollect rightly, that he had usurped the power which the law did not give him. Ex parte Merryman, Taney, 246, 266, et seq., Fed. Cas. No. 9,487. Many other instances might be cited, both in England and in this country, but it is unnecessary to enlarge upon this point, because in this case there was no emergency. There can be no doubt, it seems to me, that the action of the commissioner could not bind the city, and the court is bound so to adjudge. When the municipal assembly obstinately refused to perform its duty which the law had imposed upon it, and thereby put it out of the power of the commissioner to provide for the lighting of the streets, it would have been far better that the people of this city should have felt the inconvenience that resulted from it, in order that they might be induced to visit their indignation upon the men who were responsible, rather than that this plaintiff should lose its money, or that the courts should be asked to ratify an illegal contract. Such ratification is within the power of the legislature alone, and in so just a case as this there can be no doubt that that body will speedily relieve the plaintiffs, and make provision that such a situation cannot arise again.