(85 Misc. Rep. 78)

NEW YORK CENT. & H. R. R. CO. v. CITY OF BUFFALO.

CITY OF BUFFALO v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Equity Term, Erie County.    April 27, 1914.)

1. BOUNDARIES (§ 48*)—ACQUIESCENCE—EFFECT.

Where the location of a line can only be ascertained by a consideration of facts and data, the practical location of the line, acquiesced in by the parties in interest for many years as the boundary between their adjacent properties, must be accepted as the best evidence of the location of the line.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 232–242; Dec. Dig. § 48.*]

2. MUNICIPAL CORPORATIONS (§ 225*)—CONVEYANCES OF REAL ESTATE—"EQUI-TABLE ESTOPPEL IN PAIS."

Where a city conveyed real estate to a railroad company without complying with the provisions of its charter, and obtained, in consideration thereof, real estate conveyed by the company to it, and the city retained possession of the tract conveyed to it nearly 30 years, and erected thereon structures forming a part of its water supply system, it was equitably estopped to deny the validity of its conveyance to the company, an "equitable estoppel in pais" being defined as the effect of the voluntary conduct of a party, whereby he is precluded both in law and equity, from asserting rights which might otherwise have existed as against another, who in good faith has relied on such conduct, and has been led thereby to change his position for the worse, and who, on his part, acquires some corresponding right.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 626–641, 643; Dec. Dig. § 225.*

For other definitions, see Words and Phrases, vol. 3, pp. 2497–2508; vol. 8, p. 7655.]

3. RAILROADS (§ 73*)—CONVEYANCES—RIGHTS ACQUIRED.

A city conveyed to a railroad company a right of way for railroad tracks, in consideration of a conveyance of real estate by the company to it. The city took possession of the tract conveyed to it, and erected structures for its waterworks system. The city at the time of the conveyance to the company maintained across the right of way tunnels, pipes, and mains forming a part of its system. The city retained possession of the parcel conveyed to it for nearly 30 years, and the railroad company during that time never questioned the right of the city to maintain tunnels, pipes, and mains across the right of way. Held, that the city, though estopped to deny the validity of its conveyance, as not made in conformity to its charter, could not be deprived of its right to maintain tunnels and mains underneath the surface of the right of way and to lay new mains when necessary.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. § 73.*]

4. RAILROADS (§ 73*)—RIGHT OF WAY—RIGHTS ACQUIRED.

A deed to a railroad company of a right of way for the operation of tracks gives to the company the right to utilize any portion of the strip conveyed, and the grantor cannot encroach thereon without the license and permission of the company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. § 73.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. ADVERSE POSSESSION (§ 60*)—LICENSE—EFFECT.

One erecting a structure on the land of another under license, and not under a claim of right, cannot rely on adverse possession, where it has never asserted adverse title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 282–312, 323, 328; Dec. Dig. § 60.*]

6. RAILROADS (§ 73*)—RIGHT OF WAY—ENCROACHMENTS—ESTOPPEL.

Where a railroad company, obtaining a right of way from a city, permitted the city to erect expensive buildings for its water supply system, which encroached on the right of way, and the removal thereof would involve large financial loss to the city, and impair the usefulness of its system without conferring any substantial benefit on the company, equity would prevent the company from revoking its license to the city to maintain the structures, but if the city should, in the future, remove the structures, the company might revoke the license and resume possession of its entire right of way.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. § 73.*]

Actions by the New York Central & Hudson River Railroad Company against the City of Buffalo, and by the City of Buffalo against the New York Central & Hudson River Railroad Company. Judgment ordered.

Hoyt & Spratt' and Alfred L. Becker, all of Buffalo, for Railroad Company.

Clark H. Hammond, Corp. Counsel, and Jeremiah Hurley, both of Buffalo, for City of Buffalo.

WHEELER, J. These actions were tried together, and upon the same evidence. The first action is virtually in ejectment, but equitable relief is demanded. The complaint alleges four causes of action. The first based upon an alleged encroachment of the wall of the pumping station. The second upon the concrete platform and other constructions adjacent to the pumping station. The third and fourth upon the retaining wall upon the east side of the tracks of the railroad right of way, and of alleged repeated trespasses on the premises, and the tearing down of the wall for the purpose of constructing two conduits or water pipes. The second action is for an injunction restraining the railroad company from removing the retaining wall, and from interfering with the bridge of the city across the railroad tracks. The rights of the parties depend largely on the boundary lines of their respective properties, and these, in turn, on the location of the center line of the original right of way granted the railroad company by the Buffalo Waterworks Company, in 1853. Prior to 1852, the predecessor of both parties, the Buffalo Waterworks Company, was the owner, and in possession, of lots 28, 29, 30, and 31 of the South Village of Black Rock, now city of Buffalo. On December 24, 1853, the waterworks company, by deed, granted and conveyed to the Buffalo & Lockport Railroad Company a strip of land 32 feet wide, being 16 feet on each side of a center line of the said road, as laid down on the map of the said road on file in the office of the clerk of the county of Erie, extending through lots 28–31.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[1] The map to which reference is made cannot be found, and the location of said center line must be ascertained by other facts and data. The railroad company contends that the true center line is the present monumented line between its two railroad tracks as now laid down on the ground. The city contends that the true center line of the 32-foot strip lies from 1½ to 2 feet further to the west than at present monumented. If the contention of the city is correct, the result is that the pumping station hereinafter referred to is just so much the more over onto the right of way of the railroad company, and the retaining wall hereinafter referred to in this opinion, stands partly on the city property and partly on the railroad property, instead of entirely on the railroad property, as claimed by it. Hence will be seen the importance of the location of this center line of the 32-foot strip. The location of this line is not free from doubt at the very best, but after careful consideration of the entire testimony in this case, I have reached the conclusion that the present monumented line should be accepted as the center line of the 32-foot strip. Mr. Knapp, the former superintendent of the bureau of water, and himself a civil engineer, testified that the retaining wall on the east side of the railroad property, built in 1897, was built entirely on railroad property, and this was ascertained by actual survey from the westerly line of the right of way as conveyed by the deed of 1853. It is true that Mr. Knapp also testified that, prior to 1880, the railroad company shifted its tracks about a foot and a half to the west. This was done when a heavier steel rail was substituted for those formerly there. Mr. Knapp, however, testified that this change or shifting of the tracks was done in flattening out a curve which had existed in the tracks. This probably accounts for and explains the change, and the existence of a slight curve in the tracks would naturally throw them slightly to the east of the original center line as laid down on the map, which cannot now be produced. In any event, the maps of the respective lands of the parties to these litigations do not disclose any curves in the boundary lines, but, on the contrary, show the side lines to be straight. On straightening out the curve, the center line appears to have been monumented and the side lines located, and acquiesced in for many years, and in our judgment this practical location of the boundaries of the properties of the parties should be now ·accepted as controlling for all purposes as the best evidence of where the record would and should place them. Having disposed of this question of fact, we proceed to the consideration of the questions of law raised by these cases.

[2] One of the questions presented for the consideration of the court is as to what right or title the railroad company acquired or has in the 12-foot strip lying on the easterly side of its original right of way. This strip was conveyed to the railroad company by the city of Buffalo by deed dated June 18, 1885, and recorded in the Erie county clerk's office in Liber 560 of Deeds at page 208. The evidence shows that simultaneously with the execution of this deed, and as a consideration for it, the railroad company, by warranty deed, conveyed to the city a strip of land on the westerly side of its right of way. In other words, the railroad company and the city exchanged properties, and each party went into possession of the parcel conveyed

to it. Upon the parcel conveyed by the railroad to the city, the city erected certain substantial structures for the storage and handling of coal used in the operation of the pumping station of its public waterworks system. This parcel with the structures thereon are in use by the city for such purposes at the present time, and are necessary for the operation of its water supply system. There has been, and is now, no offer or intention on the part of the city to in any way surrender to the railroad the property thus acquired.

At the time of the conveyance by the city to the railroad company of the 12-foot strip, water mains leading from the pumping station to the streets above crossed not only the original right of way of the railroad company, but also crossed the 12-foot strip. These pipes or mains are buried, or run under the surface of the ground. In some cases the pipes or mains are conducted through tunnels built for that purpose. Although the deed by the city to the railroad company is an ordinary deed of conveyance with a covenant for quiet possession, and in form would purport to convey an absolute fee to the land described, nevertheless the railroad company has never questioned the right of the city to maintain its tunnels and water mains across the strip, and upon this trial concedes and consents that any decree this court may render in this action may preserve to the city the right to build, maintain, and operate all proper and necessary tunnels, mains, and conduits under the surface of the ground across the strip in question.

It is contended, however, by the city in these litigations, that the deed of conveyance of the 12-foot strip to the railroad is absolutely void, and the railroad company thereby acquired and has no title to it, for the reason that the strip conveyed was already held for and devoted to a public use, and under the provisions of the charter of the city then in force, the city had no power or authority to alienate or convey property so held and owned, and the deed given in 1885 was insufficient to vest in the railroad any title or interest in the strip undertaken to be exchanged.

Chapter 672 of the Laws of 1881, amending the charter of the city of Buffalo, appears to be the provisions of statute which govern the disposition of lands by the city. The amendment provides, in substance, that when the city has failed to appropriate any lands acquired by it for public use, or any part thereof, or shall have abandoned such use, the common council may authorize the sale, release, and conveyance of such lands, after the lands had been appraised in the manner provided in the statute, or by public sale to the highest bidder. Of course it is here urged by the city that the statute only confers powers to sell and convey lands unappropriated to a public use, and also that the method of disposition prescribed by the statute was not followed. When the deed to the railroad company was given, it is true its execution was authorized by a resolution of the common council of the city, but there was no appraisal by commissioners, as prescribed by the statute, or sale at public auction to the highest bidder. As the deal between the city and the railroad company was an exchange of properties, it of course was practically impossible to follow the provisions of the charter.

We shall assume, for the purposes of this discussion, that in executing the deed in question the city and its officials exceeded the powers and authority conferred upon them, and that the method provided in the statute was the only way by which the city could alienate the land conveyed. It does not follow, however, that under the circumstances of this case the city may repudiate the transaction at this time, and insist on its rights as though no such exchange had ever taken place. We think the railroad company may invoke against the city, for its protection against such a repudiation, the doctrine of an equitable estoppel in pais. An equitable estoppel in pais has been defined as—

"the effect of the voluntary conduct of a party, whereby he is absolutely precluded, both in law and in equity, from asserting rights which might have otherwise existed, either of property, or contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his condition for the worse, and who, on his part, acquires some corresponding right, either of property or contract, or of remedy."

Surely the railroad company comes squarely within the general rules and conditions entitling it to invoke the doctrine of an equitable estoppel. On its part the railroad company has parted with its title, and given possession to the city of the parcel of land on the west side of its right of way. This parcel the city has retained possession of since 1885, nearly 30 years. It has erected structures upon it, and still enjoys and retains possession. It does not even propose to restore to the railroad company the property thus acquired. In fact the property is necessary to the city for the use of its pumping station. Outside of any question of laches on the part of the city, it would seem that every consideration of right and justice ought to preclude the city at this time from taking advantage of any technical want of power or authority to do what it did in 1885, and of which transaction it has continued to enjoy the benefit to the present.

But it is urged by the city that although the doctrine of an equitable estoppel may be available to an individual, it cannot be asserted against a municipal corporation such as the city of Buffalo. There are, indeed, numerous cases holding, in substance, that where the officers of a municipal corporation fail to pursue the strict requirements of statutory enactments in contracting for the municipality, it is not bound, nor is it bound by any of its officers' acts in ratification of an illegal contract, and that a person dealing with a municipal body is bound to see that the provisions of the statute under which it is acting are fully complied with, and, if this is not done, subsequent acts of the municipal officers cannot make the contract effective.

This doctrine is laid down in the case of People ex rel. J. B. Lyon Co. v. McDonough, 173 N. Y. 181, 188, 189, 65 N. E. 963, in which many other cases to the same general effect are cited and discussed. See, also, Molloy v. City of New Rochelle, 198 N. Y. 402, 92 N. E. 94, 30 L. R. A. (N. S.) 126.

The whole subject as to what extent the doctrine of equitable estoppel may be invoked against municipalities has been discussed at great length by Judge Dillon in his work on Municipal Corporations. He calls attention to the many conflicting decisions of various states on

the subject, but at section 1194 of his work he summarizes the matter, and expresses the author's views and suggestions as to the true doctrine. He says:

"The author cannot assent to the doctrine that, as respects public rights, municipal corporations are impliedly within ordinary limitation actions. It is unsafe to recognize such a principle. But there is no danger in recognizing the principle of an estoppel in pais as applicable to exceptional cases, since this leaves the court to decide the question, not by mere lapse of time, but upon all the circumstances of the case to hold the public estopped or not, as right and justice may require."

He then proceeds to cite numerous cases of estoppel in pais, saying that the acts relied on must be of such a character as to amount to a fraud, if the city were permitted to claim otherwise.

It would indeed be tantamount of a fraud on the part of the city in this case for it to retain the property acquired by it, and at the same time seek to regain possession of that which it had parted with as the consideration for that it received and retains. It is so shocking to one's ideas of justice that no court of equity can entertain the proposition. This is a court of equity, and he who seeks equity must do equity.

There are in our own state, cases where the doctrine of an equitable estoppel has been invoked and upheld. Moore v. Mayor, 73 N. Y. 238–248, 29 Am. Rep. 134; Abells v. City of Syracuse, 7 App. Div. 501–506, 40 N. Y. Supp. 233; Nelson v. Mayor, 63 N. Y. 535; North River El. L. & P. Co. v. New York, 48 App. Div. 24, 62 N. Y. Supp. 726.

I am constrained to hold that the city of Buffalo is equitably estopped from now repudiating its grant to the New York Central & Hudson River Railroad Company of the 12-foot strip described in its deed of June 18, 1885.

[3] At the same time, I am of the opinion that the deed to the railroad company should not be construed to in any way impair the right of the city to maintain its tunnels, pipes, and mains underground, running from the pumping station across the strip, or to interfere with the city laying new or additional mains or pipes beneath the surface across this strip when it becomes necessary so to do. As matter of fact, the railroad company has never questioned this right, and upon this trial by brief of counsel and in oral argument disclaims any purpose or intention to deny this privilege to the city, and states it is willing that any decree which may be entered shall expressly provide for the recognition and preservation of such a right to the city—the railroad company simply claiming that, subject to such rights or easements, it shall be deemed the owner of the property conveyed to it, which would give it the right to lay and operate a track or tracks on and over the strip in question.

It may well be said that the equitable estoppel which we think must be recognized in this case does not go to the extent of depriving the city of the right to maintain tunnels and mains underneath the surface across the strip, for that evidently was in the contemplation of the parties to the exchange of lands, although the easement was not in express terms reserved in the deed itself. This view is in harmony with the decision in the case of N. Y. C. & H. R. R. R. Co. v. City of Buffalo, 200 N. Y. 113, 93 N. E. 520, where under the city charter, the

city took in fee a strip of land across the whole width of the railroad company's right of way for the purpose of opening a street, and the court held that it must not be deemed to have been the city's intention to exclude the railroad from the lands, for the reason that their use for railroad purposes and for a highway crossing at the same time was not inconsistent. This view of the respective rights of the parties in the 12-foot strip preserves all the practical and substantial rights of both parties, and we believe is in accordance with law and justice.

[4] The evidence further discloses that the Buffalo Waterworks Company contracted with the Buffalo & Lockport Railroad Company the predecessor in title of the New York Central & Hudson River Railroad Company, to grant a right of way through lots 28, 29, 30, and 31, in the South Village of Black Rock, upon condition that the railroad company "should at its own cost and charge, construct, build and maintain a wall and certain other works and improvements * * * for the protection and improvement of" the premises of the waterworks company. On December 24, 1853, by a deed containing a preamble reciting the foregoing facts, and further that the wall had been constructed, as well as the railroad, the waterworks company did "concede, grant, release and assure" to the railroad company, "the said right of way for a double track for its aforesaid road, as the same is now laid out over and constructed by the party of the second part, and through said lands and premises, that is to say, a tract or strip of land 32 feet wide, being 16 feet on each side of a center line of the said road or track of said party of the second part as laid down on the map of its said road on file in the office of the clerk of the county of Erie, extending through lots 28–31."

As we have determined the location of this center line, the retaining wall so built falls within the lines of the 32-foot right of way granted by the Waterworks Company. At the time this deed was given and the railroad built, the easterly wall of the old pumping station was located some distance westerly of the westerly retaining wall. In 1872 it was proposed to build a new pumping station, and the city obtained from the railroad company verbal permission to build its easterly wall on top of this westerly retaining wall. It was so built in 1873, and is substantially the same as the location of the present easterly wall of the new pumping station, except that the easterly wall of the present pumping station and coalhouse extends 132 feet further to the north, on top of an extension of the retaining wall built by the city. This new pumping station was built in 1905.

[5] The deed from the waterworks company simply conveyed a right of way. It did not vest the fee of the land in the railroad, but did give to the railroad the right to operate double tracks over the 32-foot strip. The right to occupy the subsurface for any purpose not inconsistent with the operation of the railroad on the surface remained. The city contends that, inasmuch as the deed was simply that of a right of way for a double track, it had a right to utilize any portion of the 32 feet not actually occupied by the railroad for those purposes, and, inasmuch as the railroad is undisturbed in its right to maintain and operate two tracks, it cannot maintain an action for encroach-

ments on the strip conveyed. We are not impressed with the contention. We think it was the clear purpose of the deed to give to the railroad the right to use and enjoy the surface rights of the entire 32 feet, and that right cannot be encroached on by the city, or any one else, without the license and permission of the railroad company. Such a license was in fact given when by verbal arrangement consent was given the city to build the easterly wall of its pumping station on the retaining wall previously constructed by the railroad company. The city has pleaded the statute of limitations as a bar to the maintenance of this action. We are of the opinion, however, that having erected its structures under a license, and not under claim of right, it cannot now contend that its possession has been adverse. It has never, so far as the evidence discloses, asserted adverse title until these proceedings were begun, and there is nothing in the case which justifies this court in holding the statute of limitations ever began to run.

On the other hand, the railroad company argues that, inasmuch as the permission given to build on the retaining wall was a mere license, such a license can only be granted by deed and not by parol (White v. Manhattan R. Co., 139 N. Y. 19–24, 34 N. E. 887), it is therefore terminable at any time, and no adverse possession is created thereby. (St. Vincent's Orphan Asylum v. City of Troy, 76 N. Y. 108–113, 32 Am. Rep. 286; Wiseman v. Lucksinger, 84 N. Y. 31, 38 Am. Rep. 479; Cronkhite v. Cronkhite, 94 N. Y. 323; Eckerson v. Crippen, 110 N. Y. 585, 18 N. E. 443, 1 L. R. A. 487; Stephens v. N. Y., O. & W. R Co., 175 N. Y. 80, 67 N. E. 119).

[6] Notwithstanding that the railroad company contends this is the law of the case, its counsel expressly states that it does not ask for the removal of the wall of the pumping station, but does ask that it be adjudicated that such wall, in so far as it stands east of a line 16 feet west of the center line of the right of way, stands on railroad property, and stands there under a revocable license, and that the claim of the city to the land on which it stands, by adverse possession, is unfounded. We think that under the circumstances of the case, where the railroad company has permitted the city to erect expensive buildings which encroach on the railroad lands, and where the removal of the wall would involve large financial loss to the city, and doubtless would, in a disastrous degree, impair the value and usefulness of a pumping station erected at the cost of many thousands of dollars, without conferring any substantial benefit on the railroad company itself, and where these structures have continued to exist for a great many years, equity will not require the removal of the pumping station wall. The same rule of equity which operates as an equitable estoppel against the city repudiating its grant of the 12-foot strip will also prevent the railroad company from revoking the license to the city to maintain its pumping station wall on the top of the retaining wall. If, however, at any time in the future the city should remove the wall in question and rebuild its pumping station, then the railroad company may revoke its license and resume possession of the property within the 32-foot right of way, and obtain the aid of the court to that end.

The discussion and opinions expressed in the foregoing portions of the opinion dispose of the principal question presented for discussion,

and indicates the rights which the court conceives the parties hereto have in the subject-matter of the litigation.

Findings should be prepared in accordance with the views here expressed. The form of the particular findings will be settled upon notice.

We think the judgment to be entered should be without costs to either party in each action.

In closing, we venture to express the opinion that the differences of the parties to this action should be amicably adjusted. Both are engaged in a public service, and we believe that reasonable concessions by both parties would accomplish more for the good of each than the enforcement by the court of the technical rights of the parties.

We suggest an effort to reach a fair adjustment of their differences.