BELT LINE RAILWAY CORPORATION, Plaintiff, *v.* CITY OF NEW YORK and Others, Defendants.

Supreme Court, New York County, May, 1922.

**Municipal corporations — the city of New York cannot maintain bus lines — injunction — when operation of buses a waste of public funds which will be restrained on application of taxpayer.**

The board of estimate and apportionment of the city of New York by a vote of all its members in March, 1922, adopted a resolution authorizing the commissioner of plant and structures to arrange for the necessary motor vehicles and to operate or to regulate and supervise the operation of the same along certain described routes including the Sixty-fifth street crosstown line at a rate of fare not exceeding five cents. Pursuant to said resolution there was established a crosstown line of five or six motor buses on said street running from Avenue A on the east, through said street and Central Park, and then by Sixty-sixth and other streets to West End avenue, and returning by the same route. The motor buses having conspicuous signs thereon reading: " City of New York, Department of Plant and Structures, Avenue A to Sixty-sixth Street and West End Avenue, Fare 5 Cents," though owned by private individuals to whom permission to run over the route is given in the form of a " starter's card," are run under the supervision and inspection of the commissioner of plant and structures and on schedules fixed by him. In a taxpayer's action by a competing street railroad corporation to restrain the city from operating the motor bus line on Sixty-fifth street there was neither claim nor proof that the buses take the place of any abandoned line in or near said street. It further appeared that none of the positive provisions of the city charter, of the Transportation Corporations Law, or of the Public Service Commission Law had been complied with by the city or by its board of estimate and apportionment or by any of the defendant owners of the buses in question. *Held*, that a motion for an injunction *pendente lite* will be granted.

While the transit commission in connection with any plan of readjustment for the relief of traffic emergency was by section 108 of the Transit Act of 1921 given authority to make contracts for the use of streets for stage and omnibus routes, the legislature at the same session also, and at three other sessions including that of 1922, refused to pass a bill, urged in behalf of the city, to so amend the city charter as to give power to the board of estimate and apportionment to authorize and establish motor bus routes over any of the streets and parkways of the city and the operation thereof by the city without the consent or action of any other board or body. *Held*, that intention and purpose, so manifested, conclusively show that neither the city nor any one of its constituted authorities

has any power to attempt to relieve a so-called emergency which is neither sudden nor unexpected, but may be better described as a deplorable chronic condition in the transit situation.

The cost of operation to the city is not only a waste of public money but is a clear violation of the constitutional provision (Const. art. VIII, § 10) that no city shall give or loan money or credit to or in aid of any individual or corporation, nor shall any city incur any indebtedness except for city purposes.

The proposed new line at Sixty-fifth street, which gives no transfers, is parallel with the Fifty-ninth street crosstown line of the plaintiff, and the claim by the city that the new line has become necessary because of the elimination of certain transfers by plaintiff on its crosstown line, tends to show that it is a competing line in spite of the city's contention to the contrary.

MOTION for injunction *pendente lite.*

*Alfred T. Davison (Frederic W. Frost, Addison B. Scoville* and *Alfred T. Davison,* of counsel), for plaintiff.

*John P. O'Brien (William E. C. Mayer,* of counsel), for defendant.

DELEHANTY, J.   This application by the plaintiff, as a taxpayer and railroad corporation, to enjoin during the pendency of this action the city of New York, the board of estimate and apportionment, the members thereof, the commissioner of plant and structures and certain other defendants from operating a certain motor bus line on Sixty-fifth street in this city must be granted.   The papers show that in March, 1922, the board of estimate and apportionment, by a vote of all its members, adopted a resolution which authorized the commissioner of plant and structures " to arrange for the necessary motor vehicles and to operate, or to regulate and supervise the operation of the same " along certain described routes, including the Sixty-fifth street crosstown line, at a rate of fare not exceeding five cents, " and to use the staff of the department of plant and structures in so far as it may be necessary to carry out the purpose " of the resolution.   In pursuance of the resolution the commissioner established a crosstown line of five or six motor buses on Sixty-fifth street, running from Avenue A on the east, through said street and Central Park, and then by Sixty-sixth and other streets to West End avenue, and returning by the same route.   These motor buses are owned by private individuals, but have conspicuous signs thereon reading as follows:   " City of New York, Department of Plant and Structures, Avenue A to Sixty-sixth Street and West End Avenue, Fare 5 Cents."   Permission in the form of a mere " starter's card " is given to these private owners of the motor buses to run on the route in question. The operator has a state omnibus license, a chauffeur's license and a policy of insurance to indemnify the owner against accidents, but not the city.   The buses are run under the supervision and inspection of the commissioner of plant and structures, and on

schedules fixed by him. The supervision and inspection of the buses on the various bus lines by a " chief bus supervisor " two " deputy chief supervisors " and by about twenty " bus starters " as employees of the city, with salaries ranging from $4,000 to $1,800 per year, cost the city about $46,000 per year. Although the owners of the buses are acting as common carriers of passengers for hire, and the operation of the buses is successful, yet the city receives no revenue therefrom and all the profits go to private individuals. The city does not have, nor claim to have, any power or authority under its charter to act as a common carrier or to operate motor buses on its streets. In fact, the city at each of the last four sessions of the legislature has sought unsuccessfully to obtain such power for the board of estimate and apportionment. Section 1458 of the city charter prohibits the operation of any stage or omnibus route upon any street in the city until and unless a franchise therefor shall be obtained from the board of estimate and apportionment in the manner prescribed by the charter. By section 74 thereof no grant of a franchise to use any street can be made by said board before a public hearing has been held, after the publication in full of the petition therefor and of the notice of such hearing. The board also must make inquiry as to the money value of the franchise, and the proposed contract, together with the form of resolution for granting the same, shall be entered in the minutes, and the separate and additional approval of the mayor shall be necessary for the validity of every such contract or resolution. The Transportation Corporations Law, in section 25, provides, among other things, that any owner or operator of a motor bus line on any street of a city shall be deemed to be a common carrier under the Public Service Commission Law and " shall be required to obtain a certificate of convenience and necessity for the operation of the route or vehicles proposed to be operated; " and section 26 of that law provides that no bus line nor motor vehicle line carrying passengers for fifteen cents or less, or in competition with another common carrier, shall be operated upon any street in any city " nor receive a certificate of public convenience and necessity " until the owner shall have procured, after public notice and a hearing, the consent of the local authorities to such operation upon such terms and conditions as such local authorities may prescribe, including, among other things, compensation for wear and tear of pavement, safeguarding passengers, and, if required, the giving of a bond in an amount and form satisfactory to the local authorities, providing security for the prompt payment of any sum accruing to the city; and the performance of any other obligations, as well as adequate security

for the payment of any damages suffered by any person on account of the operation of such line, or any fault in respect thereto. Section 53 of the Public Service Commission Law provides, in substance, that no common carrier shall exercise any franchise without first having obtained the permission and approval of the commission under whose jurisdiction such franchise is to be exercised, and that such commission has power to grant the same " whenever it shall after due hearing determine " that such exercise of the franchise is " necessary or convenient for the public service." In the instant case not one of the foregoing positive provisions of the charter, of the Transportation Corporations Law, or of the Public Service Commission Law, has been complied with by the city or by the board of estimate and apportionment, or by any of the defendant owners of the motor buses in question. No pretense is made that the law has been complied with, and the only defense interposed by the city is the plea that an emergency exists in the transit situation in the city of New York, and that requests have been made by citizens and organizations located near the Sixty-fifth street crosstown line for the establishment of that line, and that there is a necessity therefor. Counsel for the city calls attention to the discontinuance of lines, and parts of lines, of transportation in different parts of the city, but there is no claim, and no proof that the Sixty-fifth street crosstown line of motor buses takes the place of any abandoned line in or near the street in question. Neither bankruptcy nor the disintegration of any transportation line has affected this new line. No emergency exists. An emergency is something sudden, unexpected, calling for immediate action, urgent and pressing. The Appellate Division in the second department has already passed upon the questions here involved, and its decision has been affirmed by the Court of Appeals. In *Brooklyn City Railroad Co.* v. *Whalen*, 191 App. Div. 737; affd., 229 N. Y. 570, the Appellate Division, per Mr. Justice Blackmar, said: " The word ' emergency ' is defined as a sudden or unexpected occurrence or condition calling for immediate action. This can hardly be applied to a permanent condition of inadequacy of service, and it is plainly to be seen that there is no emergency which justifies the continued operation of the stage lines." In that case, as here, counsel for the defendant contended that the city operation of stage lines is authorized by the so-called Home Rule Act (Gen. City Law, art. 2-A), but the court held, in the language of the court, " that the Home Rule Act does not contain any grant of power to the city, express or implied, to operate lines of transportation in the streets." The court further said: " Section 25 of the Transportation Corporations Law requires the owner or operator of a stage route in

the streets of any city to obtain a certificate of convenience and necessity. This has not been done. * * * The anomalous situation is that while the statute expressly prohibits the operation unless under a franchise (Greater N. Y. Charter, § 1458), the city has, in plain disregard of the provisions of its own charter, without granting a franchise, authorized individuals to run these automobile stages on established routes through the streets for their own profit. If the welfare and convenience of the citizens require additional accommodations for transit such as would be furnished by established stage routes, there is a legal way to accomplish the result. * * * But the city has no power of municipal operation; nor has it the right to authorize others so to use the streets without observing the conditions to a legal and regular grant of a franchise." The contention of counsel for the city to the effect that much of the above decision " has been nullified by the legislative declaration of any emergency in the Transit Act of 1921 " is wholly without merit. That argument entirely ignores the significance of the fact that the legislature established the transit commission as the exclusive and sole agency for " the relief of the emergency " by a broad and comprehensive " plan of readjustment." By section 108 of the Transit Act the transit commission, in connection with any such plan, is given authority to make contracts for the use of streets for stage and omnibus routes. At the same session also and at three other sessions, including the last, the legislature refused to pass a bill, urged in behalf of the city, to amend its charter so as to give power to the board of estimate and apportionment to authorize and establish motor bus routes over any of the streets and parkways of the city and the operation thereof by the city without the consent or action of any other board or body. Thus not only by what the legislature has done, but also by what it refused to do, its intention and purpose become clearly expressed. *Matter of City of Niagara Falls* v. *P. S. Comm.,* 229 N. Y. 333, 338, 340. That intention and purpose, so manifested, conclusively show that neither the city nor any one of its constituted authorities has any power to attempt to relieve a so-called emergency which is not sudden or unexpected, but may be better described as a deplorable chronic condition in the transit situation. So, too, the analogy and argument sought to be drawn by counsel for the city from the emergency rent laws have no relevancy or application to the instant case, as those laws were enacted by the legislature, having full power, and have been held to be constitutional and a valid exercise of the police power of the state. That is entirely different from an attempt to relieve an emergency by a local board of a local city, having no power under

the charter, and to which the legislature has expressly refused to give any such power. Moreover, the cost of operation to the city without any revenue in return is a clear waste of public money. By section 10 of article 8 of the Constitution it is provided in substance that no city shall give or loan money or credit to or in aid of any individual or corporation, nor shall any city incur any indebtedness except for city purposes. Hence there is not only a waste of public moneys, but there is also a clear violation of the Constitution by the city. The proposed line at Sixty-fifth street is parallel with the Fifty-ninth street crosstown line of the plaintiff, and the claim by the city that the new line has become necessary because of the elimination of certain transfers by the plaintiff on its crosstown line tends to show that it is a competing line in spite of the city's contention to the contrary. The new line gives no transfers, and the mere fact that it may be convenient for a small part of the community is no justification for its unlawful existence. The plaintiff, therefore, as a taxpayer and competing railroad, having shown a violation of law and a waste of public moneys, has the right to maintain this action to restrain such illegal acts on the part of all the defendants. Counsel for the city contends that the court in the exercise of " a wise and sound discretion " should not interfere with any temporary transportation designed to serve the public convenience. Such a discretion, however, would be neither " wise " nor " sound." No court of equity can sanction such a clear violation of law without itself becoming lawless and a menace to a sound and wise administration of justice. Settle order on notice.

Ordered accordingly.