In the Matter of the Application of PASCAL C. J. DEANGELIS and Others, Constituting the Board of Education of the City of Utica, N. Y., Petitioner, for a Mandamus Order against DANIEL LAINO and Others, Respondents.*

Supreme Court, Oneida County, February 25, 1931.

* See, also, 141 Misc. 535.

*Kernan & Kernan*, for the petitioner.

*J. Herbert Gilroy, Corporation Counsel of the City of Utica*, for the respondents.

DOWLING, J.  In May, 1930, the board of education of the city of Utica employed Dr. George D. Strayer and Dr. N. D. Engelhardt to make a survey of the Utica school system.  These gentlemen made the survey requested and filed a written report with said board in part as follows: " For construction purposes, the American Institute of Architects has grouped buildings under five types as follows:  Type A-A building constructed entirely of fire-resistive materials, including its roof, windows, doors, floors and finish.  Type B-A building of fire-resistive construction in its walls, floors, stairways and ceilings, but with wood finish, wood or composition floor surface, and wood roof construction over fire-resistive ceiling.  Type C-A building with masonry walls, fire-resistive corridors and stairways, but with ordinary construction otherwise, *i. e.*, combustible floors, partitions, roofs and finish.  Type D-A. building with masonry walls, but otherwise ordinary or joist construction and wood finish.  Type E-A frame building constructed with wood after foundation, with or without slate or other semi-fireproof material on roof."

They also commented upon the fact that the only school buildings having adequate protection against fire hazard are the Conkling and the Seymour and the new part of the Roosevelt.  They strongly recommended in said report *" that in all the buildings to be continued in use exits which are absolutely fireproof from the*

*second floor to the outside of the building be installed at the earliest possible moment."*

On July 1, 1930, Mr. Joseph N. Sullivan, chief of the Utica fire department, addressed the following letter to the board of education:

" UTICA, N. Y., *July* 1st, 1930.

" BOARD OF EDUCATION, CITY OF UTICA, Utica, N. Y.

" Attention of Mr. E. O. FOLSOM, Secretary.

" DEAR SIR: The Fire Department was very much interested in the school survey of Dr. George D. Strayer, particularly in its fire protection phase. Dr. Strayer recommends absolutely fire proof exits from the second floor in school buildings, except the modern fire resistive schools, estimating the cost of the fire proof exits at $200,000.00. This suggestion is a commendable one but it is believed that for this sum the entire group of buildings of a hazardous type could be 100 per cent sprinklered. The sprinklering of a building in our estimation makes every exit substantially fire proof as such a system protects every square foot of combustible surface. It is true that once the occupants of a building reach a fire proof tower they are safe but during the time they were passing through the school to the tower they are subject to the hazards of an existing fire. With a sprinkler system properly installed and properly supervised the starting of a fire in such a building means the starting of the extinguishing of the fire. The sprinklering of school buildings would likewise develop into an economy as a much lower rate of insurance is set for a sprinklered building. We respectfully recommend to the Honorable Board that an immediate start be made to completely sprinkler every school building within the City. The writer would be pleased to have the Board call on him for a conference on this subject at their convenience.

" Sincerely yours,

" J. N. SULLIVAN,

" *Chief.*"

Upon receipt of Chief Sullivan's letter, the board communicated with Dr. George D. Strayer, asking for his opinion relative to the suggestions contained in Chief Sullivan's letter. On July 15, 1930, Dr. Strayer replied in part as follows: " I have your letter, including a copy of a letter from Fire Chief J. N. Sullivan. I am sure that sprinkling a school building reduces very largely the fire risk. In some cases cities have decided to sprinkle the area immediately surrounding the heating plant, as has been done in a number of Utica buildings, and, in addition to this protection, to sprinkle the corridors and stairways. I am still of the opinion that a fire-

proof exit from the second floor should be provided for Class 'C' and 'D' buildings. There is, of course, the expectation that the sprinkle system will put out the fire. I should feel safer, however, to know that when children get to the fire tower they are safe, regardless of whether or not the sprinkle system is wholly effective. * * * With kindest personal regards, I am

"Yours cordially,

"GEORGE D. STRAYER."

On July 17, 1930, Chief Sullivan appeared before a regular meeting of the board and urged the desirability of installing complete sprinkler systems in all schools in the city of Utica not fire resistive. The board, thereupon, appointed a committee of its members, consisting of Commissioners Leonard Ferris and Leon W. Platner, to make a thorough investigation of the fire protection needs of the schools and to report back to the board at the earliest possible date.

On July 21, 1930, said committee submitted a written report of its investigation. The committee recommended that in Union, Lansing South, Franklin and Francis schools (soon to be abandoned) that sprinkler systems should be installed in the basements, stairways and corridors. That in Potter, Albany, Kernan (including open air school and attic), Brandegee, Capron, part time schools, and the administration building, that complete sprinkler systems should be immediately installed.

The board immediately adopted an appropriate resolution for initiating the carrying into effect of said recommendation.

The committee also recommended that other schools in the system should be protected by both fire towers and sprinkler systems, and that plans for sprinkler systems should be deferred until plans for the fire towers were completed.

The board, thereupon, adopted a resolution instructing its secretary to employ architects to begin plans for the fire towers in conference with Messrs. Strayer and Engelhardt, in the following school buildings: The old part of Roosevelt school, Mary street school, Sunset school, Egbert Bagg school, Miller street school, Bleecker street school, Wetmore street school, Kemble street school, Washington school and Lincoln school.

On July twenty-eighth the board adopted a resolution authorizing its secretary to advertise for bids for a complete sprinkler system for each of the following schools: The old parts of Utica Free Academy, Roosevelt school, Miller street school, Sunset avenue school, Egbert Bagg school, Mary street school, Bleecker street school, Wetmore street school, Kemble street school, Washington and Lincoln schools.

On August 5, 1930, petitioner adopted the following resolution: " *Be it Resolved,* that in the judgment of this board [the board of education of the city of Utica] the safety of our school children requires that fire towers be installed in the following schools: Roosevelt School (old part), Sunset School, Miller Street School, Egbert Bagg School, Bleecker Street School, Wetmore Street School, Washington School, Kemble School, Lincoln School and Mary Street School.

" That this board estimates the amount of funds necessary for said purposes to be $148,500.00.

" That the Honorable, The Common Council of the City of Utica, is hereby respectfully requested to cause to be raised and placed to the credit of this board for said purpose the said sum of $148,500.00 by means of a bond issue.

" That the Secretary of this board transmit to the Honorable Common Council a certified copy of this resolution."

The board transmitted to the city clerk of the city of Utica, on August 5, 1930, for presentation to the common council of the city of Utica, a certified copy of said resolution.

On August 7, 1930, the board, by appropriate resolution, directed the preparation and transmission of the following letter to the mayor of the city of Utica:

" *August 7, 1930.*

" Hon. CHARLES S. DONNELLEY,
    " Mayor of the City of Utica,
        " Utica, New York.

" DEAR SIR: As you are probably aware, the recent survey of our public schools conducted by Doctors Strayer and Engelhardt, New York City, has disclosed dangerous conditions in respect to fire hazard. Their reports showed that three of our schools were adequate fire resistive buildings and that one was fair. All of the rest of our school buildings were condemned as being less than one-third as safe as they should be. Chief Sullivan of our local fire department has amply confirmed the warnings of Doctors Strayer and Engelhardt in this respect. Since this condition has been drawn to our attention this board has bent every effort to find the remedies therefor. From the best advice we could secure, we decided that it was necessary to install sprinkler systems, partially or completely, in practically all of our schools. It will be necessary to take further steps, but the sprinkler system is the first definite step which we have been able to prepare for installation. In order to present the Common Council with a clean-cut proposition, we determined to advertise for bids and then apply to the council at its regular meeting for a bond issue necessary to

defray the expense of the lowest bids. This was done, and, on August 6th, a request for a bond issue in the total amount of $180,500.00 was submitted to that body. You understand, of course, that there were two reasons for our haste in the matter. The first was our desire to protect the lives of the children. The second was the necessity of having the work done at some time when the schools would not be too greatly disturbed. For this reason, we desired to have the work done during the summer months rather than after school hours and at an expense incurred by overtime labor. Unfortunately, however, we were unable to explain these matters in detail to the council at its last regular meeting. While we feel, as a Board, that we have discharged our full duties in the matter, it seems to us that the present situation constitutes an emergency and where human life may possibly be endangered, we can leave no stone unturned in our efforts to proceed as rapidly as possible. We, therefore, request you to call a special meeting of the Common Council to be held as soon as possible for the purpose of considering and acting upon the aforesaid request for a bond issue of $180,500 to be used for the purpose of installing sprinkler systems in the schools. We call your attention to one other factor in the situation. The bids which we have received are based on the amount of time intervening between August 6 and the date on which school opens. While we do not believe that the bidders will object to the delay which has already intervened, if the matter is allowed to run for a period exceeding a very few days, we cannot possibly expect them to fulfill their contracts on the bids which have been previously submitted. We again request your consideration and haste in this matter.

" Very truly yours,

" BOARD OF EDUCATION OF UTICA, N. Y.

" By...................,

" *Secretary.*"

August 4, 1930, Mayor Donnelley replied to the above letter as follows:

" *August Fourth,* 1930.

" BOARD OF EDUCATION, Utica, N. Y.

" Attention, MR. E. O. FOLSOM, Secretary.

" GENTLEMEN: This is to acknowledge receipt of your communication under date of August 7th written by your Honorable Body within twenty-four hours after the first presentation of your application for a bond issue in the sum of $180,500.00 to the Common Council of the City of Utica. Investigation discloses that the request of your Honorable Body for the same was pre-

sented on the evening of August 6th to the Common Council, at which meeting the subject was referred to the Finance Committee of that Honorable Body. This reference to the Finance Committee was in accordance with the orderly procedure of city government, and I would suggest that your Honorable Board confer with the members of said Finance Committee relative to the issuance of said bond issue in the sum of $180,500.00. Until such time as the Finance Committee has had opportunity to consider your application, the calling of a Special Meeting of the Common Council by the writer would be an empty gesture and nothing gained thereby. It may develop that after a conference between your Honorable Body and the Common Council Finance Committee some understanding may be arrived at regarding this requested bond issue and a Special Meeting of the Common Council could then be called and definite action taken regarding the matter.

" Yours very truly,
" (Signed)      CHARLES S. DONNELLEY,
" *Mayor*."

On December sixteenth, said finance committee of the common council of the city of Utica addressed the following communication (which the board ignored) to the board of education of the city of Utica:

" CITY OF UTICA
" DEPARTMENT OF LEGISLATION
" UTICA, N. Y.
" *Dec. 16, 1930.*

" The Committee on Finance of the Common Council, hereby requests a definite statement of your requirements, for the year 1931, on projects which will require the issuance of public improvement bonds. It is the purpose of this committee to formulate a plan not to issue a greater total of bonds during the year 1931, than the bonds that will mature and be retired. By such action, the bonded indebtedness of the City of Utica, will not be increased and we urge your co-operation towards such a program. Where the bond requirements of 1931 are a part of a program, to extend over a number of years, information and data relative to such a program are requested.

" Respectfully yours,
" COMMON COUNCIL COMMITTEE ON FINANCE
" (Signed)      CHARLES A. THOMAS, *Chairman*."

The said finance committee, so far as disclosed by the papers submitted herein, has made no report to the common council relative to the issuance of the bonds in question, nor has the common

council expressly refused to issue said bonds. It simply has not issued them. Being unable to procure action on the part of the respondents herein, for the issuance of the requested bonds, the board served notice upon said respondents on the 27th of December, 1930, that upon the facts contained in the petition and affidavit annexed to said notice an application would be made to the Supreme Court, at a Special Term thereof, to be held at Utica, N. Y., on the 5th of January, 1931, for a peremptory mandamus order directed to the respondents, " commanding them to enact the necessary ordinances for the issuance of the two certain issues of bonds, in the amounts of $180,500.00 and $148,500.00, respectively, as requested by the Board of Education in said petition set forth and commanding the said Charles S. Donnelley, as Mayor of the City of Utica, to approve the said ordinance and commanding Charles S. Donnelley, Willard H. Roberts, William S. Pugh, J. Herbert Gilroy and Joseph B. Shaw, constituting the Board of Estimate and Apportionment of the City of Utica, to issue said bonds or for an alternative mandamus order directed to them, and each of them, commanding them and each of them to do and perform such acts and duties, or show cause why the command of said order ought not be obeyed and for such other, just and further relief as may be proper."

The respondents filed " returns and amended returns " wherein they admit substantially all of the allegations of the petition, except the allegation that the respondents are obliged under the law to issue the bonds requested by the petitioner herein and that the immediate issuance of said bonds is required to meet an emergency. Respondents submit affidavits of Hon. Charles S. Donnelley and Joseph N. Sullivan putting in issue the charge that an emergency exists in respect to fire protection in certain of the city schools. The affidavit of Chief Sullivan is as follows:

" STATE OF NEW YORK   ⎫
   COUNTY OF ONEIDA   ⎬ ss
     CITY OF UTICA   ⎭

" Joseph N. Sullivan, being duly sworn, deposes and says that he is over the age of twenty-one years and is the Chief Engineer of the Bureau of Fire, Department of Safety, of the City of Utica, New York; that the said Utica Fire Department is completely motorized and unquestionably the most efficient and capable Fire Department of any City in the State of New York; that the following is a correct table setting forth the exact time within which the Utica Fire Department would arrive at the scene of a fire at any Public School within the City of Utica:

| School | Nearest Fire Co. | Time in Minutes |
|---|---|---|
| Academy | Engine No. 1 | $2\frac{1}{2}$ |
| Albany Street | Engine No. 5 | $3\frac{1}{2}$ |
| Bleecker Street | Engine No. 2 | 2 |
| Brandegee | Engine No. 6 | 4 |
| Capron | Engine No. 12 | 5 |
| Egbert Bagg | Engine No. 1 | $3\frac{1}{2}$ |
| Francis Street | Engine No. 1 | 3 |
| Franklin | Engine No. 3 | 2 |
| Seymour | Engine No. 10 | 3 |
| Hughes | Engine No. 9 | $3\frac{1}{2}$ |
| Kemble | Engine No. 1 | $3\frac{1}{2}$ |
| Kernan | Engine No. 7 | 3 |
| Lansing Street | Engine No. 5 | $1\frac{1}{2}$ |
| Lincoln | Engine No. 7 | $3\frac{1}{2}$ |
| Washington | Engine No. 7 | $3\frac{1}{2}$ |
| Mary Street | Engine No. 5 | 3 |
| Miller Street | Engine No. 8 | 3 |
| Potter | Engine No. 4 | $2\frac{1}{2}$ |
| Conkling | Engine No. 5 | $3\frac{1}{2}$ |
| Roosevelt | Engine No. 8 | $3\frac{1}{2}$ |
| South Street | Engine No. 8 | $2\frac{1}{2}$ |
| Sunset | Engine No. 12 | 2 |
| Union Street | Engine No. 2 | $2\frac{1}{2}$ |
| Wetmore Street | Engine No. 6 | 2 |

" Deponent further says, that only thirty or forty-five seconds should be added to the above time figures in order to cover hooking up and placing lines which total is the actual time consumed from the first stroke of the fire gong to actual working operations at the fire scene at any of said Public Schools.

" JOSEPH N. SULLIVAN.

" Sworn before me this 2nd day
of January, 1931.
" MARIE B. PHELAN
" Commissioner of Deeds."

The affidavit of Mayor Donnelley is in part as follows: " Deponent further states, that investigation made by him discloses that the so-called fire towers recommended by Dr. Strayer are nothing but fire proof exits within or without a building. If, as contended by Fire Chief Sullivan, the sprinkling of a building, makes every exit substantially fire proof, the erection of fire towers are unnecessary. The language contained in the petition accredited to Chief Sullivan is as follows: ' The sprinklering of

a building in our estimation makes every exit substantially fire proof as such a system protects every square foot of combustible surface.' Deponent further states, that from a business standpoint it would be a waste of money to install sprinkler systems in those public schools which are to be abandoned within the next five years under Dr. George D. Strayer's school program plan, as it would be an equal waste of funds to erect fire towers in connection with the same. As to those schools which are soon to be abandoned, deponent believes that sound business judgment would dictate the detailing of a local fireman, a member of the Utica Fire Department, in each of said five schools during the school hours of each week as adequate fire protection in addition to that already provided. Deponent further states, that as to the other public schools which have been recommended by the Board of Education to be one hundred per cent sprinklered, further investigation might disclose that the financing of this installation program could be readily accomplished through certain of the Fire Insurance Companies, who would pay for the installation out of the fire insurance premiums now paid by the Board of Education for fire insurance. Deponent further states, that during Fire Prevention Week on Monday, October 6th, 1930, that fire drills were held in the following schools, and said school buildings were completely emptied and children out of the schools within the following times:

| School | Time |
| --- | --- |
| Capron | 30 seconds |
| Conkling | 2 min. 5 sec. |
| Seymour | 55 seconds |
| Wetmore | 1 min. 38 sec. |
| Lansing | 53 seconds |
| South | 1 min. 20 sec. |
| Mary | 1 min. 13 sec. |
| Roosevelt | 2 min. 35 sec. |
| Hughes | 2 min. 10 sec. |
| Bagg | 1 min. 18 sec. |
| Union | 1 min. 30 sec. |
| Bleecker | 1 min. 30 sec. |
| Albany | 1 min. 30 sec. |
| Kernan | 2 min. 45 sec. |
| Francis | 1 min. |
| Washington | 1 min. 35 sec. |
| Brandegee | 1 min. 45 sec. |

" That from the aforesaid table it appears that the two schools which require more than three and one-half minutes for the Fire Department to be on the spot, to wit: Capron and Brandegee, are

completely emptied in a fire drill in thirty seconds and one minute and forty-five seconds, respectively. Deponent further states, as Mayor of the City of Utica, that no provision of law has been made at any time giving the Board of Education of the City of Utica the absolute right or authority to have an appropriation for a bond issue from the Common Council of the City of Utica and Board of Estimate and Apportionment. Deponent further states, that unless the right and power to control the authorization of bond issues was vested in the Common Council and Board of Estimate and Apportionment, there would be no control over the funded debt of any municipal corporation, and particularly, no control on the extravagance of a Board of Education in expenditures on projects which are to be financed by taxes payable in installments through bonds issued therefor. * * * Deponent further states that no mandatory right to have a bond issue for any school project is given to the Board of Education, but only in the event that the majority of taxpayers and citizens of the City of Utica shall have voted in favor of said project recommended by the Board of Education, is there any obligation on the part of the Common Council and the Board of Estimate and Apportionment to authorize an appropriation for the issuance of bonds to cover said project. * * * Deponent further states, that he fully appreciates the high standing of our local public schools and that he is convinced of the spendid service being rendered in the administration thereof. Deponent further states, that personally he seriously questions the advisability of the Board of Education planning on making a capital expenditure of $328,627.00 without providing a single additional seat for the pupils of our public schools. Deponent further states, that he is in favor of the future development and enlargement of our public school system, the accomplishment of the same, however, to be brought about along conservative lines, on sound business principles and with due regard to the condition of the funded debt of the City of Utica.

" CHARLES S. DONNELLEY.

" Subscribed and sworn to before me this
9th day of January, 1931.
" MABEL A. EHRESMAN,
" Notary Public, Oneida County, N. Y."

Before passing upon the right of petitioner to the relief sought herein, it is necessary to determine two underlying propositions, viz.: (a) Does a fire hazard emergency exist in certain of our public schools in the city of Utica? (b) If such an emergency exists is it mandatory upon the part of the common council of the

city of Utica to enact an ordinance authorizing the issuance of the bonds in question and upon the mayor of the city to approve said ordinance and upon the board of estimate and apportionment to issue such bonds?

In this State our courts have defined the word " emergency " to mean a sudden or unexpected occurrence or condition calling for immediate action. (*North River Electric Co.* v. *New York*, 48 App. Div. 14, 20, 23; *Brooklyn City Ry. Co.* v. *Whalen*, 191 id. 737, 742; affd., 229 N. Y. 570; *Belt Line Ry. Corp.* v. *City of New York*, 118 Misc. 665, 668.) Other jurisdictions define it thus: " An emergency is some pressing necessity out of the ordinary state of things, which can only be remedied by the use of unusual expenditures." (*Samuels* v. *City of Clinton*, 211 S. W. 567.) An emergency is an unforeseen occurrence or combination of circumstances calling for immediate action. (*San Christina Inv. Co.* v. *City & County of San Francisco*, 167 Cal. 762.) An emergency is equivalent to a public calamity resulting from fire, flood or like disaster, or through some unusual occurrence not reasonably subject to anticipation by any provision. (*Lyons* v. *City of Bayone*, 101 N. J. L. 455.)

In *Brooklyn City Ry. Co.* (*supra*) the court said (at p. 742): " The appellant contends that the maintenance of the bus lines is justified by emergency, and the inadequacy of the service of the street railway lines is put forward as creating the emergency. The defendant was authorized by the board of estimate and apportionment to establish these lines last fall, and the buses are still running on the streets. The word ' emergency ' is defined as a sudden or unexpected occurrence or condition calling for immediate action. This can hardly be applied to a *permanent condition of inadequacy of service, and it is plainly* to be seen that there is no emergency which justifies the continued operation of the stage lines."

" The Legislature has given to the word emergency, a new and peculiar meaning, namely, a permanent condition of insufficiency of service or of facilities resulting in social disturbance or distress." It has such significance in the Housing Legislation and in the Transit Commission Law applying to New York city. (*Huff* v. *City of New York*, 202 App. Div. 425, 426.) It has not defined it in the Education Law.

The danger of fire hazard in the above schools has existed since the construction of the same. It is no worse now than it has been for many years past. The mere fact that the Strayer report focuses attention on it does not convert it into an emergency, at least, not as a matter of law. It, at least, points to the existence of an exigency " where something helpful needs to be done at once;

an emergency is more pressing, and naturally less common than an exigency." (*Hurst* v. *City of Millersburg*, 294 S. W. 788, 789.) The statute in question does not cover an exigency.

The affidavits of Mayor Donnelley and Chief Sullivan put the question as to the existence of an emergency in issue upon the facts. Subdivision 8 of section 877 of the Education Law (added by Laws of 1917, chap. 786) provides: "*A board of education may, to meet emergencies which may arise*, submit a special estimate [to the common council], in which items for extraordinary expenses may be submitted to meet such emergencies." This subdivision of said section, unlike subdivisions 2 and 3 thereof, does not provide that whenever *in the judgment of the board an emergency exists*, it may submit a special estimate, etc. The statute simply permits the board of education, in the event of an emergency, to submit a special estimate. The statute is silent as to who shall declare the existence of an emergency, and the reason for this undoubtedly is that ordinarily an emergency is self evident. As to whether or not an emergency exists in this instance, rational minds might reasonably differ; hence, testimony should be given of the facts upon which the alleged emergency is predicated, so that a correct conclusion may be reached upon the subject. The board has never declared the existence of an emergency by official action on its part based upon the facts in hand. It merely asserts that an emergency exists. Under those circumstances, the question is an open one to be adjudicated by trial.

This brings us to the second question as to whether or not it is incumbent upon the respondents, as a matter of law, to authorize and issue the bonds asked by the petitioner herein, if an emergency in fact exists.

By chapter 786 of the Laws of 1917, in effect June eighth of that year, the Legislature amended the Education Law by adding article XXXIII-A thereto. Section 3 of said chapter provides as follows: "All acts or parts of acts, general or special, inconsistent with the provisions of this act are hereby repealed."

Chapter 137 of the Laws of 1842, under which the educational affairs of the city of Utica were transacted prior to the enactment of said chapter 786 of the Laws of 1917, and all amendments thereto, were specifically repealed, so that it is unnecessary to review generally the powers which the board of education had and exercised under said chapter 137 of the Laws of 1842, as amended.

Subdivision 1 of section 875 of the Education Law (added by Laws of 1917, chap. 786) provides: "A board of education is authorized and it shall have power to *purchase, repair, remodel, improve* or *enlarge* school buildings or other buildings or sites, and

to construct new buildings, subject to such limitations and restrictions and exceptions as are herein provided."

Subdivision 1 of section 877 of the Education Law (added by Laws of 1917, chap. 786) provides: " The board of education in each city having a population of less than one million shall prepare annually an itemized estimate for the current or ensuing fiscal year of such sum of money as it may deem necessary for the purposes stated in this section. * * * Such estimate shall be for the following purposes:

" a. The salary of the superintendent of schools, associate, district or other superintendents, examiners, directors, supervisors, principals, teachers, lecturers, special instructors, auditors, medical inspectors, nurses, attendance officers, clerks and janitors and the salary, fees or compensation of all other employees appointed or employed by said board of education.

" b. The other necessary incidental and contingent expenses including *ordinary repairs* to buildings and the purchase of fuel and light, supplies, textbooks, school apparatus, books, furniture and fixtures and other articles and service necessary for the proper maintenance, operation and support of the schools, libraries and other educational, social or recreational affairs and interests under its management and direction. The provisions of this section in regard to the purchase of light shall not apply to a city having a population of one million or more.

" c. The *remodelling* or *enlarging* of buildings under its control and management, the construction of new buildings for uses authorized by this chapter and the furnishing and equipment thereof, the purchase of real property for new sites, additions to present sites, playgrounds or recreation centers and other educational or social purposes, and to meet any other indebtedness or liability incurred under the provisions of this chapter or other statutes, or any other expenses which the board of education is authorized to incur."

Under chapter 137 of the Laws of 1842, as amended, the commissioners of common schools of the city of Utica determined the amount of funds which should be included in its estimate for the support and maintenance of the public schools, and their estimate could not be increased or decreased, or in any way changed or altered by the city of Utica, common council of said city, or any body or officer thereof. This being so, by subdivision 5 of section 877 of the Education Law it is the duty of the common council to include the amount of such estimate in the tax and assessment roll of the city.

Subdivision 5 of section 877 provides as follows: " The board of

education in each other city of the second class shall file such estimate with the mayor. The common council of each city included within the provisions of this subdivision shall include the amount of such estimate in the tax and assessment roll of the city and the same shall be collected and placed to the credit of the board of education as herein provided, *except that a tax for the purposes specified in paragraph ' c ' of subdivision 1* of this section shall be levied payable in installments and bonds therefor shall be issued and sold as hereinafter provided." Subdivision " c " relates to the remodelling, enlarging, construction and equipment of new buildings and the purchase of new sites. It does not relate to situations created by emergencies.

" Remodel " means to model anew, to reconstruct. " Enlarge " means to make larger, to increase in capacity, dimensions or extent. (Webster Collegiate Dict. [3d ed.] Merriam Series.)

The petitioner does not seek to remodel or enlarge any of the schools in question. Consequently, the limitation of $25,000 provided for in subdivision 2 of section 877 of the statute (added by Laws of 1917, chap. 786, as amd. by Laws of 1922, chap. 346) for remodelling or enlarging buildings mentioned in subheading " c " of subdivision 1 of section 877 does not apply.

Nor is the board seeking to repair any of said buildings, as " repair " means to restore to a certain state after decay or injury. (Webster Collegiate Dict. [3d ed.] Merriam Series.) It does seek to *improve* the condition of said buildings. The board of education is authorized by the statute to improve educational buildings. (§ 875, subd. 1.) To " improve " means to turn to good account, use to good purpose or advantage, to better. (Webster Collegiate Dict. [3d ed.] Merriam Series.) There is no limitation as to the amount that the board of education may include in its annual estimate for the repairs or improvements to buildings.

If an emergency arises, the board may submit a special estimate, in which items for extraordinary expenses may be submitted, to meet such an emergency. When such special estimate is submitted, subdivision 8 of section 877 provides: " The same method of procedure shall be followed in submitting such estimate and such estimate shall be subject to the same consideration and action as is required in the submission, consideration and action upon the regular annual estimate submitted by the board of education. The common council in such a city shall have power to make the appropriations requested by a board of education in such special estimate." The council is also authorized to provide money for improving school buildings in the city of Utica by chapter 658 of the Laws of 1923 (Art. III, § 1, subd. 16), which is " An act

to supplement the general laws, relating to the government of the city of Utica."

It is mandatory upon the common council to include the board's annual estimate in the tax and assessment roll of the city to be collected and placed to the credit of the board and no power is given to the common council or to the city or to any officer or agency thereof to increase, diminish or change any item contained in said annual estimate.

Since the statute provides that a special estimate, submitted to meet an emergency, shall be subject to the same consideration and action as is required in respect to the annual estimate of the board, it follows that the common council of the city, the city itself or any officer or agency thereof, cannot increase, diminish, alter or change such special estimate in any particular; hence, must authorize the required expenditure.

Respondents contend that by section 877, subdivision 2, the board of education cannot compel the common council to issue bonds for any purpose in excess of $25,000, without the proposition for which the money is to be spent is submitted to the voters of the city and approved by them. This argument may or may not be sound so far as the remodelling and enlarging of buildings, the construction of new buildings or the purchase of property for new sites is concerned (that question is not before the court), but it loses sight of the fact that there is a special provision of the statute which authorizes unlimited expenditures to meet emergencies and that said subdivision 2 of section 877 does not then apply. The Legislature never intended that, in case of calamity, resulting in destruction of school buildings, the board of education, charged with the duty of furnishing school facilities, would have to await the uncertain verdict of the people at an election, if an expenditure in excess of $25,000 were involved, before it could compel the common council to authorize expenditures to meet the emergency thus created. The statute is capable of no such interpretation.

If an emergency in fact exists, the common council, upon presentation to it of the special estimate for extraordinary expenses to meet the emergency under subdivision 8 of section 877, " may temporarily borrow the amount appropriated on city certificates of indebtedness or by the issuance of revenue bonds, or other municipal bonds, which certificates of indebtedness or bonds shall be payable at such time and in such manner as shall be provided by general laws or the charter of such city or other certificates of indebtedness or revenue bonds."

In order to give effect to the language of subdivision 8, the word " may " is to be construed as meaning " must." If an emer-

gency really exists and the board of education submits a special estimate, it is mandatory upon the council to authorize the expenditure by issuing some form of temporary certificates of indebtedness to meet the expense created by the emergency and to include the amount in the next tax and assessment roll to be made up for the city, as provided by subdivision 5 of section 877. (*Matter of Fleischmann* v. *Graves,* 235 N. Y. 84, 92.) The council, however, may select any of the methods permitted by the general laws or the charter of the city for the raising of the required fund. The board of education cannot dictate the choice the council shall make in this respect. It can go no further than to compel the council to authorize the expenditure and the other agencies of the city to carry the council's authorization into effect.

Boards of education are corporations. (Education Law, § 300.) As a corporation, the petitioner has " wide discretion in determining policies, and its exercise in a given matter is not subject to review by the court unless there is clearly error in the performance of a legal duty." (*Van Campen* v. *Olean General Hospital,* 210 App. Div. 204, 209; *Hentz* v. *Long Island R. R. Co.,* 13 Barb. 646, 649.) Unless the action of a corporate body, like the petitioner herein, is " arbitrary or capricious " it will not be reviewed. (*Matter of Grade Crossings* [*N. Y. C. R. R. Co.*], 255 N. Y. 320, 322.) The action of the respondents in failing to issue the bonds as requested was not capricious or unreasonable under the circumstances.

Had the petitioner, by appropriate action in the instant matter, declared that an emergency existed, the court would hesitate to permit the respondents to go behind the determination of the board except upon showing facts to bring themselves within the above rules. The petitioner, having failed to declare the existence of an emergency, cannot maintain this proceeding unless it can establish on a trial that an emergency does exist. This being the case, a peremptory order of mandamus will not issue in the first instance. But petitioner is entitled to the issuance of an alternative order of mandamus so as to give it an opportunity to establish, if it can, the existence of an emergency, and, therefore, its right to a peremptory order of mandamus. (*People ex rel. McMackin* v. *Board of Police,* 107 N. Y. 235, 240; *People ex rel. Wilson* v. *African W. M. E. Church,* 156 App. Div. 386, 389; *Matter of Blatz* v. *Esser,* 189 id. 763, 765, 766; *People ex rel. City of N. Y.* v. *Queens County W. Co.,* 197 id. 356, 357.)

This court has nothing whatever to do with the wisdom of installing fire towers and sprinkler systems in said schools and

does not pass upon that question. (*Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110, 125.)

The court is unable to reach the conclusion it is asked to draw from the very able argument advanced by Corporation Counsel Gilroy to the effect, in substance, that the board of education is powerless to compel the common council to authorize the expenditure in question.

Respondents contend that mandamus will not lie against the common council because it is a legislative body. The law is to the contrary. (*People ex rel. Commissioners, etc.,* v. *Common Council of the City of New York*, 45 Barb. 473, 475; *People ex rel. Ready* v. *Mayor*, 144 N. Y. 63, 66.) Mandamus will also lie against city officers and city boards. (*Matter of County of Ulster* v. *State Dept. of Public Works*, 211 App. Div. 628, 631; *People ex rel. Weatherwax* v. *Watt*, 115 Misc. 120; affd., 197 App. Div. 929.)

As to the wisdom of the Legislature lodging unlimited power in the board of education of a large city, see *Matter of Emerson* v. *Buck* (230 N. Y. 380, 388).

Care should be taken in preparing the alternative order of mandamus as the peremptory order must follow it. (*People ex rel. Green* v. *D. & C. R. R. Co.*, 58 N. Y. 152, 159.)

Ordered accordingly.